# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

———————————————————

Garey Smith,
     Petitioner,


       vs.                         Case No. 1:07cv977
                                     (Dlott, C.J.; Black, M.J.)


Warden, Southern Ohio
Correctional Facility,
     Respondent.


———————————————————

## REPORT AND RECOMMENDATION

———————————————————


      Petitioner, a prisoner in state custody at the Southern Ohio Correctional Facility in Lucasville, Ohio, has filed the instant *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254. He challenges his October 24, 2004 convictions after retrial for felonious assault and having weapons while under disability, as well as his August 6, 2008 sentence after two remands for re-sentencing, in Hamilton County, Ohio, Court of Common Pleas criminal case No. B-0103491. (*See* Docs. 1, 25, 33; Doc. 38, Ex. 41).

      This matter only recently became ripe for adjudication. Petitioner was allowed to amend the petition to reflect the August 6, 2008 re-sentencing determination and updated state court procedural history, with the most recent amendment to the petition filed on January 29, 2009. (*See* Docs. 25, 27, 33).[1] In response, respondent has filed a supplemental return of writ responding to the

---

[1] In a separate Order issued this date, petitioner has been granted leave to supplement the record to further update the state court procedural record with a pertinent ruling by the Supreme Court of Ohio on March 25, 2009, which the undersigned has considered herein. (*See* Doc. 45).

allegations contained in the amended petition; transcripts of the challenged state criminal pretrial and trial proceedings; and additional documents contained in the state court record that were requested by the Court.  (Docs. 38, 39, 40, 52).[2]

## Factual And Procedural Background

This case has a convoluted procedural history involving retrial proceedings, two remands by the Ohio Court of Appeals stemming from petitioner's challenged convictions and sentences at his second trial, and a prior federal habeas petition filed by petitioner with this Court before his second trial commenced in the state courts.

The criminal charges brought against petitioner arose from a shooting incident on May 14, 2001, which resulted in the death of one victim, Jimmie Gordon, and serious injury to three other victims – Jeffrey King (also known as "Dingo"), Steven Franklin, and Andre Ridley.  In the decision on direct appeal after petitioner's retrial, the Ohio Court of Appeals provided the following summary of the pertinent facts giving rise to the criminal charges based on testimony presented at the second trial:

### Background Information

Smith lived in a high-crime area of Cincinnati.  He continually called the police to report drug dealing and loitering in and around his East 12th Street residence.  On May 13, 2001, the night before the shootings, Smith called 911 to report that he had been robbed at gunpoint outside his home.  On the 911 tape, Smith said that he was scared and sounded frightened.  The 911 operator had to continually remind him to breathe.  His testimony ... about this event was consistent with what he reported on the tape: five black men had attacked him; several of the men took money from his pockets; and one of the men forced him to the ground, held a gun to his head,

---

[2]  Also pending before the Court for ruling are petitioner's non-dispositive motions "to reconsider bail issue" (Doc. 20), "to supplement record" (Docs. 26, 45), "to compel production of documents" (Doc. 28), "for recusal" of the undersigned magistrate judge (Doc. 31), "to expand record" (Doc. 41), "to submit handwritten notes from second and third trial proceedings" (Doc. 43), "for leave to conduct discovery" (Doc. 47), "for Discovery Hearing" (Doc. 49), "for Sanctions" (Doc. 50), and to compel discovery (Doc. 51).  These motions have been considered and ruled on in a separate Order issued this date.

warned him that he was tired of Smith calling the police, and threatened to kill him if he continued to do so.

Based upon Smith's descriptions of his assailants, the police identified as suspects Jerry Tolbert, Nick Grant, and Kevin Grant. Nick Grant matched the description Smith had given of the gunman.

The police believed that there had been an ongoing dispute between Smith and the suspects but found inconsistencies in Smith's story that he had been robbed. The officers interviewed the three suspects who had remained in the area but declined to charge any of them with robbing Smith at that point in the investigation. Nick Grant was arrested on an outstanding warrant, but he was released the next day. Tolbert and Kevin Grant were let out of police custody in front of Smith's home after a forty-three-year-old woman claiming to be the grandmother of thirty-two-year-old Tolbert provided the men with an alibi.

Smith testified that he was angry when the suspects were released. Two police officers investigating the crime testified that Smith was irate and emphatically stated, "I should just go get a gun and take care of this situation myself." Smith denied making this statement but did state that one of the officers told him either to stay indoors or to move.

Smith further testified that after the police took Nick Grant to the Justice Center, Tolbert and Kevin Grant appeared outside his home, yelling that they would kill him if he prosecuted Nick. Smith testified that he called the police at District One to report the intimidation, but no one from the police followed up on his call. Smith then retrieved his absent landlord's gun from his residence and test-fired it in the breezeway along the side of his building around midnight.

The next morning, Smith drove to a hotel with the gun and checked in for two days. He contacted his real estate agent to follow up on a loan he had applied for to purchase a house in a different neighborhood. Carrying the gun, he returned to his home in the afternoon to pick up clothing and shoes he needed for his job as a welder. He parked several blocks away from his residence on East 12th Street and took a

circuitous route on foot to return to his residence without being seen. When he approached his breezeway, a black SUV driven by Tolbert pulled up to him. Dingo and an unidentified man were passengers in the SUV. Tolbert warned Smith that if he prosecuted Nick Grant, "they" would kill him. Smith went inside and called 911. When Tolbert drove off, Smith returned to the hotel but forgot to bring with him his welder uniform.

****

## Smith's Testimony Concerning Dingo's Shooting

Smith decided to go back to his home to retrieve his work shoes and jacket he had forgotten to retrieve after his run-in with Tolbert and Dingo. He parked his car several blocks away and took the circuitous route to his home. As he approached his residence, he claimed, he saw Dingo walking out of his breezeway and zipping up his pants after presumably urinating. Music was blaring from Dingo's car, which was parked in front of Smith's residence. Smith was angry and told Dingo that he was tired of "all you guys" using his house for a public toilet. He asked Dingo why he was always in his neighborhood and told him to go home.... After telling Dingo that he had acquired a gun as a result of the robbery and threats, he showed him the gun, which was tucked in his waistband with the grip sticking out. He noticed Donald Nixon and Terry Britton down the street and told them that what he had said to Dingo also applied to them.

After Smith turned around to investigate a noise, Dingo tried to grab the gun from him. Smith feared for his life and struggled with Dingo for control of the gun. Smith aimed the gun to the side of Dingo and fired, hoping to scare Dingo into letting go of the gun. Smith fired several more times after Dingo would not let go. As Smith's back hit the wall, the gun went off again. At some point during this altercation, Smith shot Dingo. Smith claimed that he was unaware that a bullet had struck Dingo until the next day, when the shooting was reported by the news media.

Smith then ran east on 12th Street, in the opposite direction from

where Dingo had fled.  Smith took the shortest route to his car, ... traveling east on 12th Street and north on the first perpendicular street, Pendleton Street.  He held the burning-hot gun below his waist, and at the corner of East 12th and Pendleton Streets, he moved the slide back and forth to eject a casing.  He claimed that he did not reload the gun.

## Smith's Testimony about Gordon's, Ridley's and Franklin's Shootings

Smith saw Nick Grant sitting on the top of a bench just beyond a store on Pendleton Street.  He heard Grant say, "There that mother*ucker is, get him."  Six or seven men, including Jimmy Gordon and Steve Franklin, were sitting on or standing around the bench.  Gordon came up from the bench towards Smith and fired a revolver from about fifteen feet away.  Smith saw the flames of gunfire and heard the shot.  Smith fired at Gordon when he saw Gordon getting ready to shoot again.  After one shot, Gordon fell back.  Smith then shot Steve Franklin in the leg because Franklin was coming towards him.  Smith thought that Franklin was reaching for a weapon, but he never saw one.  Franklin limped for a minute and then staggered just a few steps from Smith, and Smith shot him two more times.  Franklin then fell over in the street between two parked cars.  Smith turned around to find Andre Ridley approaching him from his left side with his hand on something in his pocket.  Smith shot him and Ridley went behind the store building.

When Ridley left, Smith saw Nick Grant grab a man and hold the man in front of him as a shield while he moved back towards the store.  Grant did not appear to have a gun, so Smith decided not to shoot at him.  Instead, he continued up Pendleton Street to the Liberty Street steps, which led him to his car.  He returned to his hotel after deciding it would not be wise to wait for the police to arrive because he was afraid of more aggressors and he thought that the police might regard him as a threat if he stood in the street with his gun waiting for assistance.

Smith returned to the hotel and turned himself in to the police two days later with the assistance of Pat Berry.

# The State's Testimony about Dingo's Shooting

Dingo testified that he often visited his grandmother and his friends on East 12th Street. He knew of Smith but had never had any contact with him until the evening of May 14, 2001, when Smith shot him. Just prior to his confrontation with Smith, Dingo had pulled up in front of the Pendleton Market, several doors down from Smith's residence. He was standing in front of his car and talking to Nixon and Britton, who were across the street drinking beer. Smith walked east on 12th Street, holding a gun in his hand. Dingo asked, "What's up?" Smith looked very angry and complained to Dingo about "all types of stuff he was tired of." Dingo denied any involvement in the "stuff." Smith pointed the gun at him and said he would kill him and the individuals across the street, so there would not be any witnesses. Dingo grabbed Smith's wrists and the two "tussled" for a short time. Dingo ran west on 12th Street after Smith regained control of the weapon. Smith fired at Dingo about six times and struck him with one bullet in the back. Dingo fell to the sidewalk and no longer saw Smith. Dingo heard more shots fired around the corner about a minute later.

Dingo also testified that he had been convicted of several crimes of dishonesty as well as several felonies, including drug trafficking in 2000 and 1994.

The state established that Donald Nixon and Terry Britton were both no longer available to testify. The prosecution read to the jury their testimony from Smith's first trial. Both men testified that they had been sitting near the park at East 12th Street and Spring Street and waiting to have a drink with Dingo when Smith arrived. Both testified that Smith was very angry and made accusations against Dingo, informing him that he was tired of all the "stupid shit" from people who did not live in the neighborhood. Both testified that Smith had threatened to kill Dingo and them.

Nixon testified that he saw Dingo[] grab for Smith's gun and the ensuing struggle. He turned and ran before any shots were fired.

Britton testified that he saw Smith approach Dingo with the gun in his

waistband. But he did not see the struggle between Smith and Dingo, and he did not see Smith shoot Dingo. When Smith threatened him and Nixon, he fled to a hidden spot behind a wall. After hearing shots, Britton looked over the wall and saw Smith reload the magazine of his 9mm weapon before he started walking. On cross-examination, Britton admitted he had told the police on the night of the shooting that he had not seen Smith reload his magazine.

Both Nixon and Britton admitted to having felony convictions within the past ten years, as well as convictions for crimes of dishonesty.

****

## The State's Testimony about Gordon's, Ridley's, and Franklin's Shootings

The state presented eyewitness testimony from Lucretia Williams, Ridley, Franklin, and Darryl McGee concerning the shootings on Pendleton Street. The witnesses gave different testimony as to the exact location of Gordon when he was shot, but all four testified that Gordon was in front of the store, and not, as Smith had testified, beyond the store near a park bench.

Lucretia Williams lived in an apartment building on the southwest corner of Pendleton and East 13th Streets, diagonal from the store. After hearing what she thought were firecrackers, Williams looked out her window facing the store. She saw a man run around the corner and at some point enter the store. She saw another man walk around the corner from East 12th Street to Pendleton Street with a gun held low in his right hand. The man crossed East 13th Street and began shooting at four or five men who were standing in front of the store. After the shooting began, several men ran around the store, and one ran up East 13th Street. She did not see anyone fire back. The shooter walked up Pendleton Street to the Liberty Street steps. A few of the shooting victims came limping back around to Pendleton Street. She did not hear words prior to the shootings.

Andre Ridley testified that he was visiting friends in the Pendleton area of Over-the-Rhine on May 14, 2001. He had no contact with

Smith in the days prior to the shooting because he had been incarcerated in the Hamilton County Justice Center until the early morning of May 14, 2001. At around 10 p.m. he met ... Franklin in front of the store to pay back money he had borrowed to post bond. Jimmy Gordon, Darryl McGee, and a few other men were also standing around the front of the store closer to the intersection.

About twenty minutes later, he heard what he thought were firecrackers exploding. Nick Grant came up to Gordon and said a few things about Smith. In response, Gordon said, "I ain't got nothing to do with that shit around the corner," and he threw a few punches. Then he heard Nick Grant say "here he come." Ridley saw Smith approach and Nick Grant go into the store. Ridley testified that he did not think Smith was a threat and looked away. When he looked back, he saw Smith take a gun from his pants and fire in Gordon's direction. Gordon had his back against the wall of the store building. He did not see Gordon reach for anything in his pockets. Ridley heard two or three shots, and he and Franklin ran around the corner of the store building. After he and Franklin ran into each other and fell, Ridley realized that he had been shot in his abdomen, about three inches to the right of his midsection. Franklin was shot also. Franklin rose and said, "I'm hit, I'm hit!" Smith then shot at Franklin four more times.

... Franklin testified that he was spending time with Ridley, Gordon, Darryl McGee, and some other friends in front of the store on the evening of May 14, 2001. None of them had any weapons. When Franklin was talking to Ridley, Nick Grant walked up to the group and said, "You got to watch dude," before entering the store. Franklin saw Smith walking up from the same direction Nick Grant had come. He had never seen Smith before. Smith walked up with his hands in his pants, pulled out a gun, and shot Gordon, who was leaning against the telephone pole close to the intersection. After seeing the shooting, Franklin turned and ran around the corner of the store building, but he fell and Smith shot him in his leg. When he got up, Smith shot him again in the chest and elbow.

Franklin testified that he was shot as he was fleeing, but his medical records indicated that all of his bullet wounds were on the front of his

body.  He also testified that he did not spend time with Nick Grant and his family on East 12th Street, but on cross-examination he admitted that he had fathered two children with Nick Grant's cousin.  He also admitted that he had a recent felony conviction for drug possession.

Darryl McGee, a close friend of Gordon, Ridley, and Franklin, testified that he was in the Pendleton area on May 14 waiting for Ridley to be released from the Justice Center.  At about 10:30 p.m., he was talking to Gordon in front of the store, near where Ridley and Franklin were talking.  Nick Grant and Giovanni Wright approached them.  Grant "started playing with" Gordon, who was standing on the sidewalk near a stop sign in front of the store.  McGee, leaning against the store building, heard Grant say, "You all need to get up out of here, dude is coming down the street."  Gordon pushed Grant, and Grant went into the store.  Wright also warned them to leave.  Then Smith came up on the sidewalk, walked between McGee and Gordon, pulled a gun out of pants, and said, "I ain't got nothing else to live for," before shooting Gordon.  McGee heard two more shots and then fled down East 13th Street.

McGee admitted that he had several felony convictions over the past ten years for robbery, theft, and receiving stolen property, and that he was on post-release control at the time of his testimony.  On cross-examination, he acknowledged that he did not contact the police or prosecutor until fourteen months after the shooting, and that he lived in the same building as state's witness Lucretia Williams.

### The Police Investigation of the Shootings

The police investigating the crime scene did not find any firearms on any of the shooting victims.  But Michael Trimpe, a trace-evidence examiner at the Hamilton County Coroner's crime lab, testified that Gordon's right hand contained particles of primer residue consistent with either firing a weapon or being close to a weapon as it was fired. Trimpe found no particles of primer residue on Dingo's hands. Trimpe did not test the hands of Ridley and Franklin.

Cincinnati police crime-scene examiner Ronald Camden was called to

the scene of the shootings at 2:30 a.m. on May 15. With the assistance of three other crime-scene examiners, he examined the large crime-scene area and found twenty-three spent casings. Camden found seven spent casings on the sidewalk in front of the Pendleton Market at 418 East 12th Street and the building immediately east of the market. He testified that Dingo was shot in this area. Further to the east, at 422 East 12th Street, Camden found a live cartridge on the sidewalk. In the breezeway of Smith's apartment building, located at 426 East 12th Street, Camden found several more spent casings, apparently from when Smith had test-fired the gun. Camden found six more casings on Pendleton Street near the intersection of East 13th Street, where Gordon, Ridley and Franklin were shot.

Based upon his experience of firing a 9mm pistol for five years at the shooting range, Camden testified that the shooter was standing five to ten feet from where the spent casings were found when he fired at the men. Camden's testimony concerning the location of the shooter corroborated the state's witnesses' location testimony and contradicted Smith's testimony that he was in front of his house when he shot Dingo and that he was past the store when he shot the other men. But Camden admitted on cross-examination that the casings could have rolled down the 12th Street and Pendleton Street inclines or could have been kicked prior to the police securing the area.

Further, Camden testified that he did not find any blood or bullet marks on the front outside wall of the store that would have indicated that Gordon was standing up against the store when he was shot, as Ridley had testified.

Robert Michael Lenhoff, a firearms examiner for the Hamilton County Coroner's crime lab, testified as a firearms expert for the state. He stated that all the discharged casings found were fired from the same 9mm semiautomatic pistol. Smith did not dispute that this weapon was the one that he had carried.

The live ammunition the police found in Smith's home and in front of 422 East 12th Street was consistent in design with the spent ammunition found at the crime scenes, although there were no markings to indicate that Smith had cycled these cartridges through

his 9mm weapon.

(Doc. 38, Ex. 6, pp. 3-13) (footnote omitted).

## A. **First Trial:** *Smith I*

The Hamilton County grand jury returned the first indictment containing eleven counts against petitioner on May 24, 2001.  Specifically, petitioner was charged with one count of aggravated murder in violation of Ohio Rev. Code § 2903.01(A) with death penalty specifications; three counts of attempted murder in violation of Ohio Rev. Code § 2923.02(A) with firearm specifications; six counts of felonious assault in violation of Ohio Rev. Code § 2903.11(A) with firearm specifications; and one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(2).  (Doc. 38, Ex. 1).

After a jury trial, where petitioner "testified that he had accidentally shot King, and that he had shot the other three victims in self-defense," petitioner was found guilty of the lesser offense of murder with specifications; two counts of attempted murder with specifications; all felonious assault charges with specifications; and the weapons offense.  (*See id.*, Ex. 2; *see also State v. Smith,* No. C-020610, 2004 WL 102285, at *1 (Ohio Ct. App. 1 Dist. Jan. 23, 2004) (unpublished)).  On September 17, 2002, petitioner was sentenced to an aggregate prison term of 47 years to life, with some of the felonious assault and attempted murder convictions merged for sentencing purposes to the extent the offenses involved the same victim.[3]  (*See* Doc. 38, Ex. 2).

Petitioner appealed to the Ohio Court of Appeals, First Appellate District. He claimed in part that the trial court deprived him of his right to represent himself and that the prosecutor engaged in misconduct during closing argument.  *See Smith, supra*, 2004 WL 102285, at *1 ("*Smith I*").  The Ohio Court of Appeals reversed the convictions and remanded the case for new trial on the ground that the trial court "effectively denied Smith's constitutional right to defend himself."  (*Id.* at *7).  In so ruling, the court briefly addressed the prosecutorial misconduct claim

---

[3] Specifically, the court merged the two felonious assault convictions and attempted murder conviction pertaining to victim Steven Franklin (Counts 2-4); the two felonious assault convictions pertaining to victim Jeffrey King (Counts 5-6); and the two felonious assault convictions and attempted murder conviction pertaining to victim Andre Ridley (Counts 8-10). (*See* Doc. 38, Ex. 2).

as follows:

> We agree that the prosecutor's comments on the veracity of Smith, his admitted attempts to bait Smith into losing his temper, and his comments on facts not in evidence were improper. The prosecutor's actions under other circumstances may have provided a basis for reversal and the order of a new trial, but given our disposition of the first assignment of error, this issue has been rendered moot.

(*Id.*).

## B. <u>Second Trial</u>: *Smith II*

The case was returned to the trial court to conduct a new trial on the lesser charge of murder with specifications and all other counts contained in the original indictment that had not resulted in an acquittal at the first trial.[4] (*See* Doc. 38, Ex. 3).

On June 22, 2004, petitioner filed a motion to dismiss the renewed criminal charges based on the prosecutor's misconduct. (*See id.,* Brief, p. 4 & Ex. 30). On August 10, 2004, the trial court overruled the motion to dismiss. (*See id.*; *see also* Doc. 39, Ex. 44 Vol. 8 Tr. 34). Soon thereafter, in an effort to forestall his second trial, petitioner filed a federal habeas petition with this Court in Case No. 1:04cv579, raising the claim of a double jeopardy violation based on prosecutorial misconduct. Nevertheless, the trial court went ahead with the criminal trial, which culminated in a hung jury on the murder and attempted murder counts and verdicts of guilt on the remaining six felonious assault counts with specifications and the weapons-under-disability charge. (*See* Doc. 38, Ex. 3 & Ex. 3B, p. 2).[5]

---

[4] Because petitioner was acquitted at the first trial of the attempted murder of victim Jeffrey King, as charged in Count 7 of the original indictment, that count was excluded from consideration at the second trial.

[5] The State moved to retry the murder and attempted murder counts that were not resolved at this second trial. The trial court dismissed the attempted murder charges but granted the prosecution permission to retry the murder count. (*See* Doc. 38, Ex. 3B, p. 2). In March 2005, following a third jury trial, petitioner was acquitted of murder. (*Id.,* Ex. 3F). Petitioner's retrial on the murder count in the third trial is not the subject of the instant federal habeas action. Therefore, no claims or evidence pertaining to that trial will be considered in evaluating the claims alleged herein challenging petitioner's convictions and sentences at his second trial.

On October 29, 2004, the trial court imposed an aggregate prison sentence of 55 years and six months, which consisted of the following consecutive prison terms: eight years for each felonious assault offense, 18 months for the weapons offense, and a total of six years for the firearm specifications attached to the felonious assault counts. (*See id.*, Ex. 3).

With the assistance of his attorney at the second trial, petitioner timely appealed his convictions and sentences to the Ohio Court of Appeals, First Appellate District. (*See id.*, Brief, p. 6). Counsel filed a brief raising seven assignments of error, including the following claims:

**First Assignment of Error:** The trial court erred to the prejudice of Smith by denying his request for jury instructions on inferior offenses.

**Second Assignment of Error:** The trial court erred to the prejudice of Smith by denying his request for a reasonable continuance of the trial date, thereby denying him due process and a fair trial.

**Third Assignment of Error**: The trial court erred to the prejudice of Smith by allowing him to be tried and sentenced in violation of the Double Jeopardy Clause of the United States Constitution and the Ohio Constitution.

**First Issue Presented**: Whether Smith endured multiple prosecutions and sentences for the same offense in violation of the Fifth Amendment of the United States Constitution and the Ohio Constitution.

**Second Issue Presented:** Whether the trial court violated R.C. 2941.25 by sentencing Smith to consecutive sentences on all six counts of felonious assault when only three victims were involved.

**Fourth Assignment of Error:** The trial court erred to the prejudice of Smith by sentencing him to consecutive sentences.

**Fifth Assignment of Error:** The trial court erred to the prejudice of Defendant-Appellant by imposing the maximum possible sentence on all counts.

> **Seventh Assignment of Error:**  The trial court erred to the prejudice
> of Smith by permitting repeated instances of prosecutorial misconduct
> which deprived him of his right to due process of law and his right to
> a fair trial.

(*Id.,* Ex. 4).

In addition, petitioner submitted a *pro se* pleading, which was attached to appellate counsel's brief, raising five more assignments of error, including the following claims:

> **Constitutional Violation I:**  The court's bias created a structural error
> that tainted Smith's entire trial and denied Smith due process.

> **Constitutional Violation II:**  The court prevented effective assistance
> of counsel when it denied Smith's counsel even one reasonable and
> good faith continuance to prepare for trial.

> **Constitutional Violation V:**  The Court violated Smith's right not to
> be twice placed in jeopardy when it denied Smith's motion to dismiss
> indictment due to prosecutorial misconduct which caused a violation
> of the Double Jeopardy [C]lause.

(*See id.*).

On July 21, 2006, the Ohio Court of Appeals affirmed in part and reversed in part the trial court's judgment.  (*Id.,* Ex. 6) ("*Smith II*").  After considering all of petitioner's claims of error raised both in the brief filed by counsel and in the attached *pro se* pleading, the court in *Smith II* overruled petitioner's assignments of error except as follows:

> 1.  The court sustained the first assignment of error to the extent that
> "the trial court erred in not allowing the jury to consider the inferior-
> degree offense of aggravated assault where there was evidence that
> Smith was sufficiently provoked when he shot" Jeffrey King;
> therefore, the court held that petitioner was entitled to a new trial on
> the felonious assault charges involving King that were set forth in

Counts 5 and 6 of the indictment.  (*Id.,* p. 20).

2.  The court sustained in part the fourth assignment of error, as well as the fifth assignment of error in its entirety, because under *State v. Foster,* 845 N.E.2d 470 (2006), the imposition of "maximum, consecutive terms for the felonious assaults against Ridley and Franklin and for having a weapon under a disability" amounted to constitutional error; therefore, the sentences imposed on the remaining charges set forth in Counts 2, 3, 8, 9 and 11 were vacated and the case was remanded for re-sentencing on those counts.  (*Id.*, pp. 26-27).

With the continued assistance of his counsel, petitioner timely appealed to the Supreme Court of Ohio. (*See id.,* Ex. 7).  He presented nine propositions of law in his memorandum in support of jurisdiction:

**Proposition of Law No. I:**  At a trial for felonious assault, a defendant is denied his right to a trial by jury, when the court weighs the evidence of provocation and determines it is not sufficient to support a jury instruction on the inferior offense of aggravated assault.

**Proposition of Law No. II:**  Double Jeopardy prohibits retrial where prosecutorial misconduct is undertaken with the intention of denying the defendant an opportunity to win an acquittal.

**Proposition of Law No. III:**  Defendant is denied his rights to due process and a fair trial when the prosecutor engages in repeated instances of prosecutorial misconduct which includes arguing inflammatory facts not in evidence, accusing defense counsel of using unfair tactics, denigrating defense counsel's closing argument, claiming the defendant fabricated his defense, and ridiculing defendant's defense, all in front of the jury.

**Proposition of Law No. IV:**  Defendant is denied his constitutional rights to due process when he is forced to proceed to trial before a biased judge.

**Proposition of Law No. V:**  Defendant was subjected to Double Jeopardy when the trial court unmerged counts that had been merged

at his original trial, tried him for these same counts, and imposed consecutive sentences.

**Proposition of Law No. VI:**  Defendant was subjected to Double Jeopardy when he was tried twice and punished twice for the same conduct.

**Proposition of Law No. VII:**  A defendant is denied due process of law and his right to a fair trial when the trial court denies a reasonable request for a continuance, when trial counsel makes a professional representation to the trial court that he is not prepared to proceed.

**Proposition of Law No. VIII:**  A Defendant is entitled to minimum concurrent sentences [i]n the absence of a jury finding the additional factors necessary to impose maximum consecutive sentences.

**Proposition of Law No. IX:** A trial court violates the principles of due process by increasing the sentences after retrial without providing objective reasons for doing so.

(*Id.,* Ex. 8).

On December 13, 2006, the state supreme court declined jurisdiction to hear the case and summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. 9).[6]

---

[6] While his direct appeal was pending in the state courts, petitioner also sought to challenge his convictions and sentences at the second trial in a *pro se* petition for post-conviction relief filed with the trial court on August 12, 2005. (*See* Doc. 38, Ex. 10). The court denied the petition on May 22, 2006 on the ground that "[a]ll of the Petitioner's claims are barred by the doctrine of res judicata as they were or could have been raised on direct appeal." (*See id.,* Ex. 12). The Ohio Court of Appeals, First Appellate District, affirmed the trial court's judgment on June 8, 2007; the court reasoned that most of the claims were properly dismissed under the *res judicata* doctrine, and that the two remaining claims were properly dismissed without a hearing because they were not supported by sufficient outside evidence. (*Id.,* Ex. 16). On October 31, 2007, the Supreme Court of Ohio declined jurisdiction to hear the case on further appeal, and summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. 22).

## C. __Remand/Re-Sentencing:__ *Smith III*

On March 9, 2007, after the case was returned pursuant to the Ohio Court of Appeals' decision in *Smith II* to the trial court for a new trial on Counts 5 and 6 and re-sentencing on the remaining counts, the same attorney who had represented petitioner at trial and on appeal in *Smith II* filed a motion to dismiss on petitioner's behalf "on the basis of double jeopardy." (*Id.,* Ex. 23). On March 13, 2007, counsel also filed "objections" to petitioner's "being resentenced on Counts 2, 3, 8, and 9, and . . . to retrial on Count 5," and moved to dismiss those counts. (*Id.,* Ex. 24).

On March 23, 2007, petitioner was re-sentenced to an aggregate prison term of 36 years. Specifically, petitioner was sentenced to consecutive terms of imprisonment of eight years for each felonious assault offense charged in Counts 2, 3, 8, and 9 involving victims Steven Franklin and Andre Ridley; one year for the weapons offense; and three years for the firearm specifications attached to Counts 2, 3, 8 and 9, which were merged for sentencing purposes. (*See id.,* Ex. 25). On April 17, 2007, an "Entry of Dismissal" was filed dismissing the felonious assault charges contained in Counts 5 and 6 and the firearm specifications attached to those counts. (*Id.,* Ex. 26).

Petitioner timely appealed the March 23, 2007 re-sentencing decision to the Ohio Court of Appeals, First Appellate District. (*Id.,* Ex. 27). Petitioner's counsel filed an appellate brief raising five claims, including the following two assignments of error:

> **First Assignment of Error:** The trial court erred in imposing sentences on void counts that had been previously merged by the original trial court.

> **Second Assignment of Error:** The trial court violated Smith's federal and state constitutional rights prohibiting double jeopardy [by "imposing sentences for the same conduct against a single person;" by "sentencing Smith on counts that had been previously unlawfully 'unmerged;'" and "because of prosecutorial misconduct that occurred at Smith's first trial," which prevented the State "from trying him again on those charges."]

(*Id.,* Ex. 28).[7]

On May 23, 2008, the Ohio Court of Appeals issued its third appellate decision ("*Smith III*"), affirming the trial court's judgment in part, vacating the sentences in part, and remanding the matter again for re-sentencing. (*Id.*, Ex. 31). Specifically, the court of appeals overruled petitioner's first assignment of error, finding that the trial court had "properly retried Smith on the previously merged counts in his second trial." (*Id.,* pp. 4-5). The court, however, sustained petitioner's double jeopardy claim to the extent that "in light of the recent Ohio Supreme Court decision in *State v. Cabrales,* [886 N.E.2d 181 (Ohio 2008),] the trial court erred by sentencing Smith on four felonious-assault counts when there were only two acts and two victims." (*Id.,* p. 6).

The State filed a timely appeal to the Supreme Court of Ohio from this decision, arguing that the "*Cabrales* decision should not be applied to reduce Smith's sentences." (*Id.*, Ex. 35).

Petitioner also was permitted to file a delayed cross-appeal. (*See id.,* Brief, p. 17 & Exs. 38-39). Petitioner's counsel filed a memorandum in support of jurisdiction asserting the following claims as propositions of law on cross-appeal:

1. Following reversal and remand from the court of appeals, a defendant can only be retried on counts for which he was convicted, and any sentences that follow from an unlawful retrial are void.

2. Federal and State Due Process protections are violated when the state fails to follow the rules that are established to govern its courts.

(*Id.,* Ex. 40).

Recently, on March 25, 2009, the Supreme Court of Ohio issued an order

---

[7] Apparently, in November 2007, petitioner also filed a petition for writ of habeas corpus in the Ohio Court of Appeals for Scioto County, where he is incarcerated, claiming that he was entitled to release from prison because the Double Jeopardy Clause and other provisions barred his retrial on counts that had been merged for sentencing purposes at his first trial. (*See* Doc. 38, Brief, p. 15 n.1). The court of appeals dismissed the petition, and on September 10, 2008, the Supreme Court of Ohio affirmed the court of appeals' judgment. (*Id.*).

refusing to accept either the State's discretionary appeal or petitioner's cross-appeal, as well as dismissing the cross-appeal "as not involving any substantial constitutional question." (*See* Doc. 45).[8]

## D. Final Re-sentencing Proceeding: *Smith IV*

On August 6, 2008, petitioner was re-sentenced in accordance with the Ohio Court of Appeals' decision in *Smith III* to an aggregate prison term of 19 years. (Doc. 38, Ex. 41). Specifically, the court merged the felonious assault counts involving victim Steven Franklin (Counts 2 and 3), as well as the felonious assault counts involving victim Andre Ridley (Counts 8 and 9); petitioner, therefore, was sentenced to only two consecutive eight-year terms of imprisonment for the felonious assault offenses, which were to run consecutively to concurrent three-year prison terms imposed for the attached firearm specifications.[9] (*Id.*).

Petitioner's counsel filed a timely notice of appeal on petitioner's behalf to the Ohio Court of Appeals, First Appellate District. (*Id.*, Ex. 42). In a brief filed January 8, 2009 in this fourth appeal ("*Smith IV*"), petitioner asserted four assignments of error that were identical to claims raised by him on appeal in *Smith III*.[10] (*See id.*, Ex. 43).

Upon review of the Hamilton County Clerk of Court's on-line docketing records, it appears that a "merit hearing" recently was held on June 17, 2009 in *Smith IV* (Case No. C080770) and that the matter remains pending before the Ohio Court of Appeals for ruling.

---

[8] A copy of the Supreme Court of Ohio's March 25, 2009 Entry was obtained from the court's on-line docket system for Case No. 2008-1308.

[9] No mention was made in the August 2008 re-sentencing order of the one-year consecutive prison term previously imposed following the second trial on petitioner's conviction under Count 11 for having a weapon while under disability.

[10] A claim raised in *Smith III* challenging the sufficiency of evidence supporting petitioner's conviction on the weapons charge was not asserted in this latest appeal of petitioner in *Smith IV*.

### E.  Pretrial Federal Habeas Petition: Case No. 1:04cv579

In August 2004, after the Ohio Court of Appeals reversed his first conviction but before his second trial commenced, petitioner filed a habeas petition pursuant to 28 U.S.C. § 2254 with this Court in Case No. 1:04cv579 (Weber, S.J.; Hogan, M.J.).  In the petition, petitioner sought to prevent the second trial, arguing that it would violate his rights under the Constitution's Double Jeopardy Clause in light of the prosecutor's "egregious misconduct" at the first trial.[11] (*See* Case No. 1:04cv579, Doc. 1, p. 5).

As discussed earlier, in October 2004, during the pendency of the federal habeas petition, the trial court proceeded with the second trial, which resulted in petitioner's challenged convictions and sentences for felonious assault and having a weapon while under disability.  In March 2005, this Court stayed the federal habeas action pending petitioner's exhaustion of state court remedies.  (*See id.,* Docs. 20, 32, 33).  In February 2006, in response to a motion to alter or amend judgment filed by respondent (*see id.,* Doc. 34), the Court dismissed the petition without prejudice to refiling after petitioner exhausted his then-pending state court remedies.  (*Id.,* Doc. 38).

Petitioner appealed to the United States Court of Appeals for the Sixth Circuit, which issued an Order on April 13, 2007 vacating the Order of dismissal without prejudice and remanding the case "for further proceedings," because as respondent had conceded, "the record indicates that . . . exhaustion has now been achieved."  (*Id.,* Doc. 41).  The case was reinstated on the Court's docket on October 18, 2007 after the Sixth Circuit entered its mandate on October 16, 2007.  (*Id.,* Docs. 43, 44).

Soon thereafter, in November 2007, petitioner filed the instant *pro se* habeas petition.  The Court granted petitioner's request for appointment of counsel only in Case No. 1:04cv579.  (*See* Docs. 5, 16; *see also* Case No. 1:04cv579, Doc. 55).  However, an Order was entered in both habeas cases requiring the parties to show cause why the cases should not be consolidated.  (Doc. 6; Case No. 1:04cv579,

---

[11]  Petitioner also alleged in the petition that his right to reasonable pretrial bail was denied.  However, that claim was rendered moot by petitioner's subsequent conviction and sentence in October 2004 at the second trial.

Doc. 57).  On February 7, 2008, the Court declined to consolidate the cases for the reasons set forth in a supplemental response objecting to consolidation, which was filed by petitioner's counsel in Case No. 1:04cv579.  (Case No. 1:04cv579, Doc. 64).[12]

On January 5, 2009, the magistrate judge issued a Report and Recommendation to deny the petition filed in Case No. 1:04cv579 with prejudice. (*Id.,* Doc. 77).  In the Report and Recommendation, the magistrate judge addressed petitioner's double jeopardy claims on the merits and concluded that "petitioner has not demonstrated that he is entitled to habeas corpus relief based on his claims that his rights under the Double Jeopardy Clause were violated by (1) his retrial on criminal charges after his first conviction was reversed; or (2) the imposition of consecutive sentences on petitioner's felonious assault convictions, as corrected on August 6, 2008 on remand for re-sentencing under *Smith III*."  (*Id.,* p. 20).

It appears from the current docket records for Case No. 1:04cv579 that a final order and judgment have yet to be entered in the case.  Petitioner has filed objections to the January 5, 2009 Report and Recommendation, which are pending before the District Court for final adjudication.

### F.  Current Federal Habeas Petition: Case No. 1:07cv977

In the instant *pro se* petition, as last amended on January 29, 2009, petitioner alleges the following grounds for relief:

**Ground "A":**  Multiple violations of Double Jeopardy and Due Process under the 5th, 6th, and 14th U.S. Const. Amendments.

1.  I was twice placed in jeopardy when the state court retried me on counts that had been merged and extinguished at my first trial, and they were not convictions or involved in my appeal.

---

[12]  Specifically, counsel contended in the supplemental response that because some of the claims alleged in the later-filed petition were still being litigated in the state courts, consolidation of the cases "would create a procedural quagmire that would unreasonably delay resolution of [petitioner's] already exhausted pre-trial claims," which were then "ripe for a decision."  (Case No. 1:04cv579, Doc. 61).

2. I was subjected to multiple trials and convictions for the same offenses.

3. Intentional prosecutor misconduct prevented acquittal and caused repeated retrials.

4. I was retried on lesser offenses after being convicted for greater offenses.

**Ground "B":** Multiple violations of denial of trial by jury and the right to present a complete defense under the 5th, 6th, and 14th U.S. Const. Amendments.

1. The trial court invaded the province of the jury when it unconstitutionally weighed the evidence and made a factual determination that I was not telling the truth when I testified to the events of provocation; however, the jury requested lesser jury instructions to consider which the trial court also denied.

2. The state courts have consistently invaded the province of the jury by making factual findings instead of a jury.

3. The state courts violated *Blakely v. Washington*[, 542 U.S. 296 (2004),] by not allowing the jury to consider the degree of punishment and the issue of maximum and consecutive sentences.

4. The state court violated my right to pretrial review of Double Jeopardy issues by not allowing interlocutory appeal of trial or trial by jury as required by ORC 2943.06.

**Ground "C":** Multiple violations of Due Process and Equal Protection under the 5th, 6th, and 14th U.S. Const. Amendments.

1. The judge and prosecutors engaged in repeated instances of misconduct....

2. The prosecutors engaged in repeated instances of misconduct in closing argument....

3. The prosecutors suborn perjury and induced witnesses to lie, which "locked them in" so that [they] had to repeat the same lies during subsequent trials.

4. The trial judge displayed hostility and admitted a predisposition to defendant which caused him to be bias[ed], prejudice[d], and not impartial[.]

5. I was never given notice of the state's intentions to retry me on the merged counts, so that I could prepare or request ORC 2943.06.

6. The cumulation of errors of both state and federal laws have denied me of a protected liberty interest in having the state not only follow federal law but also state law....

7. Denied continuance and the effective assistance of counsel.

**Ground "D":** Multiple violations of the Ex Post Facto and Due Process Clauses.

1. I was sentenced under a new rule of law which took away rights of review that were in place at the time I was convicted.

2. The state courts have violated *Blakely* ... by usurping the function of the jury and applying *State v. Foster*[, 845 N.E.2d 470 (Ohio 2006),] to get around the original unconstitutional sentence with this unfor[e]seeable new judicial expansion of the law.

3. The trial court expanded the law for giving an inferior degree instruction without notice or giving me an opportunity to be heard.

(Doc. 33, Attachment).

Respondent has filed a "Supplemental Answer/Return Of Writ" responding to petitioner's allegations in the amended petition. (Doc. 38). Respondent argues in part that petitioner's double jeopardy claims alleged in Ground "A" and a portion of Ground "B" are not properly before this Court because they are duplicative of the claims raised and addressed in the January 5, 2009 Report and

Recommendation issued in the earlier-filed federal habeas action, Case No. 1:04cv579. (*Id.,* Brief, pp. 25-27). In addition, respondent asserts that petitioner's claims in Ground "D" challenging his most recent sentence of August 6, 2008 are unexhausted, and that petitioner's claim in Ground "B" challenging his October 29, 2004 sentence is moot. (*Id.,* pp. 27-29).

Finally respondent contends that petitioner has waived several of the claims alleged in Grounds "B" and "C" of the amended petition due to his procedural default in the state courts, and that petitioner has not demonstrated he is entitled to habeas relief based on the non-defaulted claims, which were presented to and considered by the Ohio Court of Appeals in *Smith II*. (*Id.,* pp. 29-58).

## OPINION

### A. Petitioner's Double Jeopardy Claims Alleged In Ground "A" And A Portion Of Ground "B" Are Not Subject To Review In This Proceeding

Petitioner essentially alleges in Ground "A" of the amended petition that his rights under the Constitution's Double Jeopardy Clause were violated when (1) he was retried despite "intentional prosecutor[ial] misconduct" at his first trial; (2) he was retried on charges that had been merged at his first trial; and (3) he was subjected to multiple punishments for the same offense.[13] Petitioner also alleges for the first time in a portion of Ground "B" of the amended petition that the state courts deprived him of his right to "pretrial review of Double Jeopardy issues by not allowing interlocutory appeal ... or trial by jury as required by ORC 2943.06."

The three double jeopardy violations alleged in Ground "A" are duplicative of claims raised by petitioner in the earlier-filed federal habeas corpus action, Case No. 1:04cv579, which have been addressed on the merits in a Report and

---

[13] Petitioner's also has alleged in Ground "A" that he "was "retried on lesser offenses" after his conviction for "greater offenses" at the first trial. However, this allegation does not trigger any double jeopardy concerns, which are implicated only in the opposite context when a defendant is retried on greater charges after conviction for lesser offenses at the first trial. *Cf. United States v. Ginyard,* 511 F.3d 203, 208-10 (D.C. Cir. 2008) (holding that Double Jeopardy Clause does not bar retrial for lesser-included offenses). Moreover, although petitioner generally avers in Ground "A" that he was subjected to "multiple trials ... for the same offenses," that allegation is simply too vague and conclusory to state a claim of a double jeopardy violation except to the extent already more specifically alleged in Ground "A."

Recommendation filed on January 5, 2009 that is presently pending before the District Court for ruling on objections filed by petitioner and final adjudication. (*See* Case No. 1:04cv579, Doc. 77). These claims are not subject to review a second time in the instant later-filed proceeding. *Cf. Ratcliff v. Moore,* __ F.Supp.2d __, No. 1:05cv582, 2009 WL 1119581, at *3 (S.D. Ohio Apr. 24, 2009) (Spiegel, S.J.; Black, M.J.) (to be published) (citing *Eberle v. Wilkinson,* No. 2:03cv272, 2008 WL 886138, at *2-3 (S.D. Ohio Mar. 28, 2008) (unpublished), in turn citing *Smith v. Sec. & Exch. Comm'n,* 129 F.3d 356, 360 (6th Cir. 1997)) (finding that (1) dismissal of claims "'truly duplicative' of those in an earlier-filed class-action involving only minor factual differences" was "appropriate;" and (2) "in the interest of judicial economy ..., 'the court in which the action was first filed' should resolve all the issues presented by the separate actions").[14]

Petitioner's additional claim alleged in Ground "B" that the state courts violated his "right to pretrial review of Double Jeopardy issues" also is subject to dismissal.

As an initial matter, it appears that petitioner has waived this claim because he never raised it to the Ohio courts. In recognition of the equal obligation of state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).

If, because of a procedural default, a petitioner can no longer present claims to the state court, he has waived them unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also*

---

[14] *See also Lawson v. United States,* No. 1:08cv11, 2008 WL 304859, at *1-2 (E.D. Tenn. Jan. 31, 2008) (unpublished) (and cases cited therein) (*sua sponte* dismissing case as "duplicative of [an] earlier suit"); *Townsend v. Vasbinder,* No. 04cv74846, 2007 WL 4557715, at *1, *3-4 (E.D. Mich. Dec. 19, 2007) (unpublished) (and cases cited therein) (dismissing all but one of petitioner's habeas claims as duplicative of and subsumed by claims alleged in a class-action complaint pending before another judge in the district).

*Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

Here, in the absence of a showing of "cause" for his procedural default in failing to raise the new claim alleged in Ground "B" until this proceeding, and in the absence of a showing of a "fundamental miscarriage of justice," the undersigned concludes that the claim is waived and thus procedurally barred from review.[15]

In any event, petitioner's allegations fail to state a claim that may be remedied in this proceeding. First, petitioner did not have a state-created right to an interlocutory appeal because, under Ohio law, the denial of a motion to dismiss based on double jeopardy principles is not a final, appealable order. *See, e.g., Klein v. Leis,* 548 F.3d 425, 430 n.2 (6th Cir. 2008) (citing *Harpster v. Ohio,* 128 F.3d 322, 325 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998), and *Wenzel v. Enright,* 623 N.E.2d 69, 72 (Ohio 1993)).

Moreover, as a matter of state law, Ohio Rev. Code § 2943.06 does not confer a right to a trial by jury whenever a defendant asserts a claim of former jeopardy. Ohio Rev. Code § 2943.06 provides in pertinent part:

> If a defendant pleads a judgment of conviction, acquittal, or former jeopardy, the prosecuting attorney may reply that there is no such conviction, acquittal or jeopardy. The issue thus made shall be tried to a jury, and on such trial the defendant must produce the record of such conviction, acquittal, or jeopardy, and prove that he is the person charged in such record, and he may also introduce other evidence to establish the identity of such offense.

The Ohio courts that have addressed the issue have indicated that Ohio R. Crim. P. 12(A) may have superseded this statutory provision to the extent that pleadings in a criminal proceeding are now limited to "the complaint, the indictment or information, and the pleas of not guilty, not guilty by reason of

---

[15] Although the undersigned has raised the procedural default issue *sua sponte,* "fair notice" and an opportunity for the parties to present their positions have been provided, because the parties may respond to the waiver issue raised herein in any objections to this Report and Recommendation.

insanity, guilty and no contest, and abolishes all other pleas." *State v. Johnson,* No. C-870124, 1988 WL 22669, at *2 (Ohio Ct. App. 1 Dist. Feb. 24, 1988) (unpublished); *see also City of Tallmadge v. Haught,* No. 18379, 1997 WL 423049 (Ohio Ct. App. 9 Dist. July 7, 1997) (unpublished) (and case cited therein); *State v. Spence,* No. 75-2, 1978 WL 216315, at *4 (Ohio Ct. App. 2 Dist. Apr. 3, 1978) (unpublished).

In any event, even assuming the continued validity of the state statutory provision, the Ohio courts have unanimously held that a defendant is entitled to a jury under § 2943.06 "only if the prosecution, in its reply, creates a factual issue by denying that the defendant was once in jeopardy for the same offense." *Johnson, supra,* 1988 WL 22669, at *2; *see also State v. Hairston,* No. 85AP-811, 1985 WL 4952, at *6-7 (Ohio Ct. App. 10 Dist. Dec. 31, 1985) (unpublished); *Spence, supra*, 1978 WL 216315, at *3-5 (explaining that the "dearth of cases involving a jury submission on the issue of double jeopardy" stems not only from the fact that only in "unusual situations" are the factual issues involved in such cases disputed, but also because "the statute itself by express implication preserves the right of the court to rule on the sufficiency of the facts").

Here, it is clear from the record that no factual issue exists that would have been subject to consideration in a § 2943.06 jury trial because there has never been any dispute that jeopardy attached at the first trial resulting in petitioner's convictions for murder, attempted murder, felonious assault and having weapons while under disability; petitioner is the person who was tried at the first trial; and the offenses prosecuted at the second trial were identical to those for which petitioner was convicted at the first trial. *Cf. Johnson, supra,* 1988 WL 22669, at *2; *Hairston, supra*, 1985 WL 4952, at *7; *Spence, supra,* 1978 WL 216315, at *6.

Contrary to petitioner's allegation, petitioner received "pretrial review of Double Jeopardy issues" when the trial court considered and ruled on his motion to dismiss filed prior to the commencement of his second trial. Petitioner has not cited, nor could the undersigned find, any case holding that the state courts are obligated under the federal Constitution to provide further pretrial review of double jeopardy claims either by way of a jury trial or an interlocutory appeal from the denial of a pretrial motion to dismiss.

In *Abney v. United States,* 431 U.S. 651, 660 (1977), the Supreme Court held that an order denying a pretrial motion to dismiss a federal indictment on double

jeopardy grounds is immediately appealable under 28 U.S.C. § 1291 in part because the protection against double jeopardy "would be significantly undermined if appellate review ... were postponed until after conviction and sentence." Moreover, relying in part on *Abney,* the Sixth Circuit has held that federal adjudication of double jeopardy claims raised in pretrial habeas corpus petitions is "appropriate when those claims have been raised and rejected in the state trial court and under state law there is no right to interlocutory appeal." *Harpster,* 128 F.3d at 325-26; *see also Klein,* 548 F.3d at 430 n.2. However, neither in *Abney* nor in the cases permitting federal habeas review of double jeopardy claims alleged in pretrial petitions, have the courts held that there is federal constitutional right to an interlocutory appeal in the state courts from the denial of a pretrial motion to dismiss based on double jeopardy grounds.

Finally, standing alone, the double jeopardy claim alleged in Ground "B" raises an issue that, even if resolved in petitioner's favor, may not be remedied in this proceeding. The writ of habeas corpus is not the proper means by which prisoners can challenge errors or deficiencies in state proceedings that address collateral matters and not the underlying conviction giving rise to the prisoner's incarceration. *See Kirby v. Dutton,* 794 F.2d 245, 247 (6th Cir. 1986).

Petitioner's claim stemming from the state courts' failure to provide either a pretrial jury trial or an interlocutory appeal is such a "collateral matter," because it does not affect or relate to petitioner's underlying convictions and sentences imposed after his retrial.

Although petitioner has alleged cognizable claims to the extent he contends his rights under the Double Jeopardy Clause were violated in this case, as discussed above, those claims have been raised and are being addressed by the Court in Case No. 1:04cv579, petitioner's earlier-filed habeas action.

**B. Petitioner Is Not Entitled To Habeas Relief Based On The Claims Alleged In Grounds "B" and "D" Challenging His Sentences Under *Blakely* And The Constitution's Ex Post Facto And Due Process Clauses**

Petitioner alleges in part in Ground "B" of the petition that the trial court committed a Sixth Amendment *Blakely* violation when it imposed maximum consecutive sentences after his second trial, because the jury was not permitted to consider "the degree of punishment" and "the issue of maximum and consecutive

sentences." Petitioner also essentially contends in part in Ground "D" of the petition that his re-sentencing under the "new rule of law" enunciated in *Foster* to remedy the *Blakely* error amounts to a violation of the Constitution's Ex Post Facto and Due Process Clauses.

As respondent has argued in the supplemental return of writ (Doc. 38, Brief, pp. 28-29), the *Blakely* claim alleged in Ground "B" is moot. In *Smith II,* the Ohio Court of Appeals sustained petitioner's claims of error challenging the constitutionality of the maximum consecutive sentences that were imposed on October 29, 2004, based on the Sixth Amendment principles enunciated in *Blakely*; the court remanded the matter for re-sentencing under Ohio's sentencing statute, as modified by the Supreme Court of Ohio in *Foster* to correct the constitutional infirmities contained in the statute. (*See id.,* Ex. 6, pp. 26-27).[16] Therefore, only the claims alleged in Ground "D," challenging the retroactive application of the *Foster* remedy on re-sentencing petitioner to maximum consecutive sentences, are subject to review herein.

Respondent argues in the supplemental return of writ that these remaining claims "are not properly before this Court" because the most recent re-sentencing decision of August 6, 2008 is "still being litigated" in the Ohio courts and is, therefore, unexhausted. (*Id.,* Brief, pp. 27-28).

Although there is a strong presumption in favor of requiring the exhaustion of available state court remedies, the requirement is not jurisdictional and may be excused under certain circumstances – *i.e.*, in cases where the unexhausted claims are plainly meritless, or the petition does not even raise a colorable federal claim, and it therefore is in the interests of the parties and judicial economy to promptly address the merits of the petition. *See Granberry v. Greer,* 481 U.S. 129, 131 (1987). Moreover, 28 U.S.C. § 2254(b)(2) expressly provides that an application for writ of habeas corpus may be denied on the merits notwithstanding the

---

[16] In any event, petitioner is unable to prevail on any *Blakely* claim stemming from the imposition of consecutive sentences in this case. In *Oregon v. Ice,* 129 S.Ct. 711, 717-20 (2009), the Supreme Court recently upheld the constitutionality of a state sentencing statute which constrained the trial court's discretion by requiring it to find certain facts before imposing consecutive, rather than concurrent, sentences. Although the *Foster* court held that a similar provision in Ohio's sentencing statute was *Blakely*-offending, *see id.* at 716 n.7, the Supreme Court now has made it clear that consecutive sentencing decisions do not implicate the Sixth Amendment.

petitioner's failure to exhaust state remedies.

Here, the exhaustion requirement should be excused because petitioner's claims essentially challenging the retroactive application of the *Foster* remedy on his re-sentencing are plainly meritless. This Court already has thoroughly addressed this issue in numerous other habeas cases, and has consistently and repeatedly held that the retroactive application of the *Foster* remedy in determining a sentence under Ohio law in sentencing or re-sentencing proceedings does not violate due process or ex post facto principles. *See, e.g., Smith v. Brigano,* __ F.Supp.2d __, No. 1:07cv878, 2009 WL 530113, at (S.D. Ohio Feb. 27, 2009) (Barrett, J.; Black, M.J.) (to be published); *Perkins v. Jackson*, No. 3:08cv277, 2009 WL 1362626, at *9 (S.D. Ohio May 14, 2009) (Rose, J.: Merz, M.J.) (unpublished) (and cases cited therein); *Trewartha v. Brunsman,* No. 2:07cv981, 2009 WL 614963, at *10-13 (S.D. Ohio Mar. 5, 2009) (Holschuh, J.; Abel, M.J.) (unpublished); *Haning v. Wolfe,* No. 2:07cv1093, 2009 WL 541156, at *3-5 (S.D. Ohio Feb. 27, 2009) (Watson, J.; Abel, M.J.) (unpublished); *Hooks v. Sheets,* No. 1:07cv520, 2008 WL 4533693, at *3-5, *10-19 (S.D. Ohio Oct. 3, 2008) (Beckwith, C.J.; Hogan, M.J.) (unpublished).[17]

Accordingly, in sum, petitioner is not entitled to habeas relief based on his claims alleged in Grounds "B" and "D" challenging the constitutionality of his sentence under *Blakely* or the Constitution's Ex Post Facto and Due Process Clauses.

## C. Petitioner Has Waived Several Other Claims Alleged In Grounds "B" and "C" Of The Petition Due To His Procedural Default In The State Courts

In Ground "B" of the petition, petitioner has asserted two additional claims. He alleges that the trial court "invaded the province of the jury" (1) by denying a request for a lesser offense instruction after "weigh[ing] the evidence and ma[king] a factual determination that [petitioner] was not telling the truth when [he] testified to the events of provocation;" and (2) by "consistently ... making factual findings instead of a jury." In Ground "D" of the petition, petitioner has raised numerous claims of judicial and prosecutorial misconduct. Respondent contends in the supplemental return of writ that several of these claims are procedurally defaulted

---

[17] *Cf. Rettig v. Jefferys,* 557 F.Supp.2d 830, 841 (N.D. Ohio 2008) (citing Ohio cases rejecting *ex post facto* challenges to *Foster*).

and thus barred from review because they were never presented to the state courts. (Doc. 38, Brief, pp. 29-35).

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c)*; see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present a claim through the requisite levels of state appellate review to the state's highest court or commits some other procedural default relied on to preclude review of the merits of such claim by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue the claim in the state courts, his claim for habeas corpus relief is subject to dismissal with prejudice on the ground that it is waived. *See O'Sullivan,* 526 U.S. at 847-848; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If, because of a procedural default, petitioner has not had a claim considered by the state's highest court and he can no longer present the claim to the state courts, he has waived such claim for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as respondent contends, petitioner has procedurally defaulted several of the claims alleged in Grounds "B" and "C" because he never raised them to the state courts.

First, in arguing on direct appeal in *Smith II* that the trial court had "invaded the province of the jury," petitioner claimed only that the trial court "committed reversible error when it refused to give [a] requested instruction" on the lesser offense of aggravated assault because the evidence presented at trial of provocation raised a "question of fact that only the jury c[ould] answer." (*See* Doc. 38, Ex. 4, pp. 10-11; Ex. 8, pp. 5-9). He did not assert any other claim of infringement by the trial court on the province of the jury to the state courts.[18]

Therefore, only the claim alleged in Ground "B" challenging the trial court's refusal to give the requested jury instruction was fairly presented to the state courts for consideration; petitioner has procedurally defaulted his additional conclusory claim that the "state courts ... consistently invaded the province of the jury."

Second, with respect to the numerous allegations of judicial and prosecutorial misconduct alleged in Ground "C" of the petition, petitioner raised only the following claims of judicial misconduct on direct appeal in *Smith II*, which he asserted in his *pro se* brief:

1. The trial judge "displayed bias and prejudice beginning at [petitioner's] bond hearing and throughout pretrial, trial and sentencing proceedings," which "created a structural error that tainted [the] entire trial and denied [petitioner] due process."

2. "The court prevented effective assistance of counsel when it denied [petitioner's] counsel even one reasonable and good faith continuance to prepare for trial."

(*Id.,* Ex. 4, "Additional Assignments of Error," pp. 1-6; *see also id.,* Ex. 8, pp. 12-14).

Petitioner's failure to assert any other claims of judicial misconduct on direct appeal amounts to a procedural default. Therefore, any additional claims of

---

[18] The only other claim raised by petitioner to the state courts, which arguably falls within the scope of this general allegation, is petitioner's claim that he was denied his Sixth Amendment right to a jury determination of certain sentencing factors under *Blakely.* (*See* Doc. 38, Ex. 4, p. 14). That claim has already been addressed separately herein on the merits.

judicial misconduct alleged in Ground "C" may be deemed waived in this case.[19]

Finally, petitioner procedurally defaulted all except the following claim of prosecutorial misconduct, which was the only one raised on direct review in *Smith II*:

> The "prosecution engaged in misconduct [in closing argument] when it argued facts that were not in evidence, accused defense counsel of unfair tactics, denigrated defense counsel's closing argument, argued that [petitioner] fabricated his claim of self-defense after discovery was given, and ridiculed [petitioner's] defense.

(*Id.,* Ex. 4, pp. 15-19; *see also id.,* Ex. 8, pp. 10-12).

It is conceded that petitioner cited additional instances of prosecutorial misconduct during closing argument in "Claim Number 5" of his *pro se* petition for state post-conviction relief filed in August 2005. (*See id.,* Ex. 10, pp. 5-6). However, the state trial and appellate courts held that the claim was barred from review under the state *res judicata* doctrine because it "either w[as] or could have been fairly determined in [petitioner's] direct appeal without resort to [outside] evidence." (*See id.,* Ex. 12; Ex. 16, p. 5). As noted above, the Ohio courts'

---

[19] It appears from the record that petitioner raised essentially the same claim of judicial bias and prejudice that was alleged on appeal in *Smith II* in a *pro se* petition for state post-conviction relief filed in August 2005. (*See* Doc. 38, Ex. 10). The state trial and appellate courts held that the claim was barred from review under the state procedural *res judicata* doctrine because it "either w[as] or could have been fairly determined in his direct appeal without resort to [outside] evidence." (*See id.,* Ex. 12; Ex. 16, p. 5). The Supreme Court of Ohio's summary entry on further appeal, declining jurisdiction to hear the case and dismissing the appeal "as not involving any substantial constitutional question" (*see id.,* Ex. 22), is presumed to rely on the same state ground. *See Taqwiim v. Johnson,* 229 F.3d 1154 (table), No. 99-3425, 2000 WL 1234322, at **3 (6th Cir. Aug. 22, 2000) (unpublished) (citing *Levine v. Torvik,* 986 F.2d 1506, 1517 n.8 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), and *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991)), *cert. denied,* 531 U.S. 1089 (2001). The state courts' reliance on the adequate and independent state *res judicata* doctrine in denying post-conviction relief constitutes an additional bar to review of any judicial bias claim that was not raised by petitioner on direct review in *Smith II. Cf. Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007) (quoting *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir. 2002)), *cert. denied,* 128 S.Ct. 2971 (2008); *see also Williams v. Bagley,* 380 F.3d 932, 966-67 (6th Cir. 2004) (and numerous Sixth Circuit cases cited therein), *cert. denied,* 544 U.S. 1003 (2005); *see generally Harris,* 489 U.S. at 260-63.

reliance on the state *res judicata* doctrine constitutes a procedural bar to review of these additional allegations of prosecutorial misconduct. *See supra* p. 33 n.19 (and cases cited therein).

Accordingly, in sum, only those remaining claims in Grounds "B" and "C" of the petition that were raised by petitioner or his counsel on direct appeal in *Smith II* are subject to review in this case unless petitioner can show "cause" and "prejudice" for his procedural default of any additional claims, or that a "fundamental miscarriage of justice" will occur if such additional claims are not considered on the merits herein. No such showing has been made in this case. Therefore, petitioner is not entitled to habeas relief based on the procedurally-defaulted claims alleged in Grounds "B" and "C," which are deemed waived.

### D. Petitioner Is Not Entitled To Relief Based On The Sole Remaining Claim Alleged In Ground "B" Challenging The Trial Court's Refusal To Instruct The Jury On The Lesser Offense Of Aggravated Assault

In the sole remaining claim alleged in Ground "B" of the petition, petitioner contends that the trial court improperly invaded the province of the jury when it refused to instruct the jury on aggravated assault as an offense of inferior degree to the charged felonious assault offenses.[20]

On direct appeal, the Ohio Court of Appeals sustained petitioner's claim of error as it pertained to the felonious assault charges involving victim Jeffrey King, and remanded the case for new trial on those two counts. (*See* Doc. 38, Ex. 6, pp. 17-18, 39). Ultimately, the trial court dismissed the two remanded counts and the firearm specifications attached to those counts. (*Id.,* Ex. 26). The Ohio appellate court's ruling in petitioner's favor moots any claim for relief stemming from the trial court's failure to give a lesser-offense instruction on the charges that pertained to King. Therefore, the Court's review of petitioner's ground for relief is limited

---

[20] Petitioner has alleged in Ground "D" of the petition another claim relating to this issue. Specifically, petitioner contends that the trial court "expanded the law" in ruling on the jury instruction issue without providing petitioner with notice or an opportunity to be heard. This claim, however, was never raised to the state courts. Therefore, like the other procedurally-defaulted claims previously addressed herein, such claim is waived. The undersigned will consider only the claim alleged in Ground "B" that was presented to and considered by the Ohio appellate courts on direct review in *Smith II.*

34

to the felonious assault charges involving victims Steven Franklin and Andre Ridley.

The Ohio Court of Appeals was the last state court to issue a reasoned decision addressing the merits of petitioner's claim of error in *Smith II*. In rejecting the claims pertaining to the felonious assault charges involving Franklin and Ridley, the court made findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[21] and ruled under Ohio law in relevant part as follows:

> The elements of aggravated assault are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation. Therefore, aggravated assault is an inferior-degree offense of felonious assault. The provocation mitigates the crime, rendering the provoked defendant less worthy of blame and subject to less punishment.

> The serious-provocation element of aggravated assault is statutorily defined as acting "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." Black's Law Dictionary defines the emotions demonstrating sudden passion as "rage, terror, or furious hatred."

> The serious-provocation inquiry is a factual inquiry that contains "both objective and subjective components." The provocation "must be sufficient to arouse the passions of an ordinary person beyond the power of his *** control," so that at that moment, he is "'directed by passion rather than by reason.'" In measuring the adequacy of the provocation, this objective standard does not take into account an individual characteristic of a defendant such as short-temperedness.

---

[21] Specifically, 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has neither cited nor presented any evidence to rebut the Ohio Court of Appeals' factual findings quoted herein. Therefore, he has not shown that such findings are erroneous.

Next, if the provocation was objectively reasonable, then the factfinder's inquiry shifts to whether the defendant was in fact under a sudden passion or in a sudden fit of rage when he committed the crime. During this subjective inquiry, the factfinder must consider evidence of "the '*** emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time ***.'"

Further, under the statute, the victim must cause the serious provocation and the defendant must react suddenly. Past altercations and past verbal threats do not satisfy the test for sufficient provocation where there is sufficient time for cooling off. Likewise, fear without other factors is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage. Importantly, "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations."

Before instructing the jury on serious provocation in a trial for felonious assault, the trial court must determine as a matter of law whether evidence of sufficient provocation occasioned by the victim has been presented to warrant the instruction. Where a defendant has requested the instruction, the evidence must be such that a jury could find serious provocation by a preponderance of the evidence. This evidence can be drawn from both the state's and the defendant's cases.

The test for giving an instruction on an inferior-degree offense is similar to the test applied when an instruction on a lesser-included offense is sought. Thus, if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant guilty of the inferior-degree offense and to acquit on the greater offense because of the provocation, the instruction on the inferior-degree offense should be given. In making this determination, the court must construe all the evidence in the light most favorable to the defendant.

The ultimate persuasiveness of the evidence regarding the provocation is irrelevant. Only when a court finds as a matter of law that no reasonable jury could find that the provocation was adequate and

actual may the court refuse to give a requested instruction on provocation.

****

After his struggle with Dingo, Smith feared that Dingo's "buddies" would come back to harm him. When he approached the store on Pendleton Street moments later, he claimed, Nick Grant, who had threatened him at gunpoint the night before, had ordered everyone standing around to get him. More importantly, he claimed that Gordon had fired at him, and that Ridley and Franklin, possibly armed, rushed towards him before he shot them.

Arguably Ridley's and Franklin's actions under these circumstances had the potential to provoke an objectively reasonable person into a sudden fit of passion or rage that was sufficient to incite the use of deadly force.

But the record does not contain any evidence that Smith was actually provoked when he shot Gordon, Ridley and Franklin. No witnesses testified that Smith looked angry or as if he were in a rage at this point. McGee testified that Smith exclaimed prior to firing at the men, "[F]***, I ain't got nothing else to live for." Importantly, Smith repeatedly claimed that he only fired at the men because he feared for his life. Further, he testified that he could have shot Nick Grant, who had terrorized him in the past, but chose not to do so because Grant was not armed or coming towards him.

In sum, the record does not contain evidence from which a reasonable juror could have found that Smith was, in fact, acting under sudden passion or rage when he shot at the men on Pendleton Street.

....[W]here there was no evidence that Smith was sufficiently provoked when he shot Ridley and Franklin, the trial court's refusal to allow the jury to consider the lesser-degree offense of aggravated assault was not in error....

(Doc. 38, Ex. 6, pp. 14-16, 19-20) (footnote citations omitted).

As an initial matter, to the extent petitioner claims he is entitled to relief because the trial court committed error or otherwise abused its discretion under Ohio law in deciding whether or not to give an instruction on the inferior-degree offense of aggravated assault, he raises issues of state law only that are not cognizable in this federal habeas corpus proceeding. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").

Turning to the constitutional issue, the United States Supreme Court held in *Beck v. Alabama,* 447 U.S. 625 (1980), that a defendant in a capital murder case has a constitutional right to have the jury instructed on a lesser offense in certain situations. *Beck,* 447 U.S. at 638. When a jury is given only two options, "not guilty" and "guilty of capital murder," the risk that the jury will convict when it has reasonable doubt is too great; therefore, in that limited context, a lesser-included non-capital offense instruction is required when there is evidence to support it. *Id.*; *see also Hopper v. Evans,* 456 U.S. 605, 613 (1982) (holding in a capital case that a *Beck* instruction is required only where there is "evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense" but not the greater). The Court in *Beck* expressly declined to decide "whether the Due Process Clause would require the giving of such instruction in a non-capital case." *Beck,* 447 U.S. at 638 n.7.

To date, the Supreme Court has not held that due process requires the giving of an inferior or lesser-included offense instruction in a non-capital case. *See Scott v. Elo,* 302 F.3d 598, 606 (6th Cir. 2002), *cert. denied,* 537 U.S. 1192 (2003). The United States Court of Appeals for the Sixth Circuit has interpreted *Beck* to mean that "the Constitution does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (en banc)); *see also Scott*, 302 F.3d at 606.

In *Bagby*, the Sixth Circuit refused to extend *Beck* to the non-capital context

on federal habeas corpus review of a state conviction, reasoning as follows:

> It appears to us that the Supreme Court's opinion in *Beck* is grounded upon Eighth Amendment concerns, rather than those arising from the Due Process Clause of the Fourteenth Amendment. If we are correct in that assessment, then we are not required to extend *Beck* to noncapital cases. Instead, we must determine whether the error asserted by Bagby is of the character or magnitude which should be cognizable on collateral attack. Is the failure to instruct on lesser included offenses in noncapital cases such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with rudimentary demands of fair procedure?... Experience tells us that it is not.
>
> Our view, that it is not an error of such character and magnitude to be cognizable in federal habeas corpus review, is shared by a majority of the circuits. . . .

*Bagby,* 894 F.2d at 796-97 (citations omitted).[22]

In *Bagby,* the court postulated that it was "conceivable" that certain claims might be cognizable on federal habeas review where "a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law." *Id.* at 795. The court emphasized, however, such occasions would occur only in the "most unusual circumstances," such as where the failure to give the instruction likely resulted in the conviction of an innocent person, because "it is not the function of a federal habeas court to correct errors in state law." *Id.*; *see also Todd v. Stegal,* 40 Fed.Appx. 25, 28 (6th Cir. Apr. 12, 2002) (not published in Federal Reporter), *cert. denied,* 537 U.S. 981 (2002); *McDaniel v. McKee,* No. 1:06cv125, 2009 WL 1637003, at *15 (W.D. Mich. June 11, 2009) (unpublished) (and Sixth Circuit cases cited therein)); *Jackson v. Lafler,* No. 06cv15676, 2009 WL 1313316, at *6

---

[22] *Cf. Britt v. Embry,* 302 Fed.Appx. 774, 779-80 (10th Cir. Dec. 9, 2008) (not published in Federal Reporter) (following holding of *Lujan v. Tansy,* 2 F.3d 1031, 1036 (10th Cir. 1993), *cert. denied,* 510 U.S. 1120 (1994), that "a petitioner in a non-capital case is not entitled to habeas relief for the failure to give a lesser-included offense instruction, even if in our view there was sufficient evidence to warrant the giving of an instruction on a lesser included offense").

(E.D. Mich. May 11, 2009) (unpublished).

Here, petitioner has not shown that this case involves "most unusual circumstances" where a fundamental miscarriage of justice has resulted from the arbitrary and unsupportable refusal of the trial court to give an instruction on an inferior offense in clear defiance of state law. In this case, although the Ohio Court of Appeals concluded that an instruction should have been given on the lesser offense of aggravated assault with respect to one of the victims shot by petitioner, it upheld the trial court's determination that the evidence at trial did not support an inferior-degree instruction with respect to the other two victims injured in the shooting incident. Where a state court has reviewed a habeas petitioner's request for an inferior or lesser-included offense instruction and concludes that it was not warranted by the evidence presented at trial, "that conclusion is axiomatically correct, as a matter of state law." *Bagby v. Sowders,* 894 F.2d at 795.

In any event, upon review of the transcript of the second trial, the undersigned concludes that it was reasonable for the Ohio appellate court to determine that "the record does not contain evidence from which a reasonable juror could have found that Smith was, in fact provoked" when, after his initial altercation with King, "he shot at the men on Pendleton Street." (*See* Doc. 38, Ex. 6, p. 20; *see also* Doc. 40).

Accordingly, in sum, constitutional concerns were not triggered by the trial court's refusal in this case to give an inferior offense instruction with respect to the felonious assault convictions that were upheld on appeal in *Smith II.* This is not the unusual case contemplated by *Bagby* where the failure to give such an instruction might have amounted to a fundamental miscarriage of justice that was likely to have resulted in the conviction of an innocent person. *See Bagby,* 894 F.2d at 795; *see also Scott,* 302 F.3d at 606.

Therefore, petitioner is not entitled to habeas corpus relief based on the sole remaining claim alleged in Ground "B" of the petition challenging the trial court's denial of his request for jury instructions on aggravated assault as an inferior-degree offense of felonious assault.

### E. Petitioner Is Not Entitled To Relief Based On The Merits Of His Undefaulted Claims Of Judicial Misconduct Alleged In Ground "C"

As discussed above, the following claims of judicial misconduct alleged in

Ground "C" of the petition, which were raised by petitioner and were considered by the Ohio courts on appeal in *Smith II*, are subject to review on the merits:

> 1.  The trial judge deprived petitioner of his right to effective assistance of counsel when it denied his motion for continuance to allow newly retained counsel to prepare for trial.

> 2.  The trial judge displayed hostility towards petitioner throughout the trial proceedings, which shows he was biased and "not impartial."

In the usual case, a federal habeas petitioner is not entitled to relief unless the state court's adjudication of his constitutional claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998).

A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942. An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 407-08 (O'Connor, J.).

Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must

also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also Bell v. Cone,* 535 U.S. 685, 694 (2002); *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942.

The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

1. **Denial of Continuance.**

The Ohio Court of Appeals was the last state court to issue a reasoned decision addressing petitioner's claim stemming from the trial court's refusal to grant a continuance. The court first rejected a related claim raised by petitioner's counsel challenging the decision on the ground that it constituted an abuse of discretion under state law before considering petitioner's *pro se* claim of constitutional error. In ruling on these claims, the state appellate court made findings of fact, which are presumed correct, *see supra* p. 35 n.21, and reasoned in relevant part as follows:

> In his second assignment of error, Smith argues that the trial court erred in denying his request to continue his trial when defense counsel had been retained only forty-nine days before the trial date.

> "The grant or denial of a continuance is entrusted to the broad, sound discretion of the trial judge. Several factors can be considered: the length of the delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." Ultimately the circumstances must not indicate that the court's decision was arbitrary, in violation of the defendant's due process rights.

> In January 2004, defense counsel Br[y]an Perkins was successful in appealing Smith's convictions from his first trial, because the trial

court had denied Smith his right to self-representation. On remand, the trial court set a July 2004 retrial date and appointed William Welsh and later Charles Isaly to assist Smith with his pro se representation.

In May 2004, Smith requested a continuance of the trial date. The court granted the continuance and set the case for a retrial on October 4, 2004. Forty-nine days before the trial date, in August 2004, Smith again retained Bryan Perkins as defense counsel. Perkins moved for a sixty-day continuance, primarily to give himself more time to prepare for trial and to secure a different ballistics expert.

The court held a hearing and found that a continuance was not warranted where the state was not presenting any new witnesses or evidence. The court cited the fact that a prior continuance had been granted; that defense counsel was intimately familiar with the case due to his appellate representation; that the continuance would be an inconvenience to the court and the witnesses; and that the defendant had contributed to the circumstances that had given rise to the request for the continuance.

We find the trial court's reasoning for denying the request sound. Further, the record indicates that defense counsel was prepared for trial and zealously represented Smith. Accordingly, we hold that the trial court did not abuse its discretion in denying Smith's motion for a continuance....

****

In [the] ninth [*pro se*] assignment of error, Smith argues that the trial court prevented the effective assistance of counsel when it denied defense counsel a continuance to prepare for trial.

We have held under the second assignment of error that the trial court acted within its discretion when it denied defense counsel a continuance less than three months before trial. We noted that defense counsel's performance was more than adequate, and that

although defense counsel was retained only forty-[nine] days before the trial date, defense counsel was intimately familiar with the facts and issues of the case because he had prevailed in Smith's first appeal.

Smith has not cited anything in this record to demonstrate that defense counsel was deficient or that he was prejudiced by any deficiency, which is the prerequisite for making a successful claim of ineffective assistance of trial counsel. Accordingly, we overrule the assignment of error.

(Doc. 38, Ex. 6, pp. 20-21, 35) (footnote citations omitted).

As an initial matter, to the extent that petitioner claims the trial court abused its discretion in denying his motion for continuance, he alleges an issue of state-law only that is not cognizable in this federal habeas proceeding. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). The Court's review, therefore, is limited to consideration of petitioner's *pro se* claim of constitutional error – *i.e.*, that the trial court's ruling prevented petitioner's trial counsel from providing effective assistance.

As the Ohio Court of Appeals recognized, to establish such a claim under the applicable standard of review established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984), petitioner must show: (1) his counsel made such serious errors that he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) his counsel's deficient performance prejudiced the defense by undermining the reliability of the trial result. *See id.* at 687. Petitioner has made no such showing in this case.

As the Ohio Court of Appeals reasonably found, petitioner "has not cited anything in th[e] record to demonstrate that [his] counsel was deficient or that he was prejudiced by any deficiency." (*See* Doc. 38, Ex. 6, p. 35). Moreover, most importantly, petitioner has not provided any basis for finding that his attorney, who was already "intimately familiar" with the case and was hired to represent petitioner at the second trial over one and one-half months before the scheduled trial date, could not adequately prepare for trial within that time-frame.

In any event, upon review of the record, the undersigned agrees with the state appellate court's determination that "counsel's performance was more than adequate," as well as its finding that counsel was prepared for trial and zealously represented petitioner. (*See id.,* pp. 21, 35).

Accordingly, in the absence of any showing that counsel was ineffective in representing him at the second trial, petitioner is unable to prevail on his claim that the trial court's denial of his motion for continuance prevented the effective assistance of counsel in this case.

2. **Judicial Bias.**

In *Smith II*, the Ohio Court of Appeals also addressed petitioner's *pro se* claim that he was denied a fair trial due to the bias of the trial judge, Judge Patrick Dinkelacker. In ruling on that claim, the court pointed out that petitioner had raised the same claim to the Chief Justice of the Supreme Court of Ohio in two motions for the disqualification of Judge Dinkelacker, which were filed respectively before the second trial commenced and after that trial concluded with a trial date "set before the same judge on the murder count on which the jury could not reach a verdict." (*See id.,* p. 34). The state appellate court held that it lacked authority to review the Chief Justice's decisions, and that it only had "authority to review the trial court's rulings for alleged errors of law or procedure that Smith claims stem from bias," which it had done "in this appeal and in other proceedings." (*Id.,* pp. 34-35).

Upon the Court's request, respondent's counsel has submitted additional documents from the state court records relating to petitioner's disqualification motions to Ohio's Chief Justice. (*See* Doc. 52).

Petitioner filed his first affidavit for disqualification with the state supreme court on May 24, 2004. (*Id.,* Exs. A-B). In the motion, petitioner claimed that Judge Dinkelacker, who did not preside over petitioner's first trial and was assigned as trial judge for the second trial in February 2004, had displayed "hostility, prejudice and bias toward [him] at February 23, 2004 bond hearing and at subsequent court proceedings." (*Id.*, Exs. A, C). Petitioner also alleged that the judge would not allow him to address the court at motions hearings held on May 7 and 17, 2004, set an unrealistic trial date of July 19, 2004, and displayed "collusion" with the prosecutor by directing the prosecutor to appoint new counsel

for petitioner. (*Id.*, Ex. A).

On June 3, 2004, the Chief Justice of the Supreme Court of Ohio denied the motion for disqualification, reasoning in relevant part:

> I find no basis for ordering the disqualification of Judge Dinkelacker. The transcript pages that Smith has attached to the affidavit do not reflect any bias or prejudice on the judge's part. The judge indicated at the February 23, 2004 bond hearing that he felt no bias against Smith, and he assured Smith that he is "going to get a fair trial." Also, both Smith and his attorney appear to have been given ample opportunity by the judge to address various pretrial matters in court and through written motions.
>
> As I said last year, "[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions."... In light of those presumptions, in light of Judge Dinkelacker's own statement on the record about his lack of bias, and in light of the fact that none of the judge's statements suggest that he has formed a fixed or anticipatory judgment about Smith or the charges against him, I decline to order the judge's disqualification in this case.

(*Id.,* Ex. C) (citation omitted).

On February 23, 2005, after petitioner was convicted and sentenced at the second trial, petitioner filed a motion for reconsideration of his affidavit for disqualification of Judge Dinkelacker. Judge Dinkelacker responded to petitioner's charges in a letter dated February 28, 2005 to the Chief Justice of the Supreme Court of Ohio. (*See* Doc. 38, Ex. 4, attached "Exhibit A").

On March 11, 2005, the Chief Justice of the Supreme Court of Ohio denied petitioner's motion for reconsideration. (Doc. 52, Ex. J). The Judgment Entry provided in pertinent part:

> Smith asks that Judge Patrick Dinkelacker be disqualified ... from acting on any further proceedings in Case No. B-0103491 in the Court of Common Pleas for Hamilton County. According to Smith, the

judge has made statements on the record at pretrial hearings [on the murder count slated to be re-tried at a third trial] reflecting the judge's view that Smith is guilty of murder, although Smith has not yet been convicted on that charge in the judge's courtroom. The judge also has indicated on the record that Smith is "vicious," and he has described Smith as "a ticking bomb" who "would kill again" if released from custody. Smith also contends that the judge has overlooked prosecutorial misconduct, has threatened to gag Smith on the witness stand during cross-examination, and has hampered Smith's efforts to prepare for trial.

Judge Dinkelacker has responded to the affidavit in writing. The judge states that he has treated Smith fairly at all times, and holds no bias or prejudice against him. Judge Dinkelacker describes Smith as a "most difficult defendant" who has tested the judge's judicial temperament. Still, the judge contends that he has handled the case appropriately. Smith has presented no credible evidence of prosecutorial misconduct, according to the judge, and the judge denies gagging Smith or interfering with his trial preparations.

As for the remarks about Smith on the record, Judge Dinkelacker indicates that he felt compelled to describe Smith's actions as he did in order to comply with Ohio's sentencing statutes. Smith is "a dangerous man," according to the judge, but "[h]e was provided a fair trial and [was] sentenced fairly."...

I find no basis for ordering the disqualification of Judge Dinkelacker. The judge has stated unequivocally that he has treated and will continue to treat Smith fairly, and both the tone and content of the judge's response show that he is neither biased nor prejudiced against the defendant.

****

In any event, the allegations in the affidavit do not warrant the judge's removal. Some of the concerns of the affidavit focus on the judge's rulings, including his decision to set a high-dollar, cash-only bail. While that and perhaps other decisions have been or can be challenged

on appeal, a party's disagreement or dissatisfaction with a court's rulings of law, without more, does not demonstrate bias or prejudice....  Judge Dinkelacker was entitled to issue rulings that he felt were correct on the matters before him, and nothing about his decisions – whether legally correct or not – points [to] bias or prejudice on his part.

And finally, I cannot conclude on this record that the judge holds an improper fixed judgment about Smith or has shown the kind of animosity that might warrant disqualification.  To be sure, if a judge's words or actions convey the impression that the judge has developed a "hostile feeling or spirit of ill-will," ... or if the judge has reached a "fixed anticipatory judgment" that will prevent the judge from hearing the case with an "open state of mind ... governed by the law and the facts," ... then the judge should not remain on the case.  And Canon 3(B)(4) of the Ohio Code of Judicial Conduct directs judges to be "patient, dignified, and courteous" to parties and their lawyers, even in the most difficult of circumstances.  Still, given the judge's assurances about his fairness, as well as the judge's explanation that some of his remarks were made to comply with state sentencing statutes, I find no grounds to disqualify the judge.  The judge has described in detail his willingness and ability to treat defendant Smith fairly, and I conclude that he can do so.

As I have said, "[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions."...  Those presumptions have not been overcome in this case.

(*Id.*) (citation omitted).

It is well-settled that the Due Process Clause requires "a fair trial in a fair tribunal," *Withrow v. Larkin,* 421 U.S. 35, 46 (1975), "before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 905 (1997) (citing *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821-22 (1986), and *Tumey v. Ohio,* 273 U.S. 510, 523 (1927)).

In *Railey v. Webb,* 540 F.3d 393 (6th Cir. 2008), *cert. denied,* __ S.Ct. __,

2009 WL 1344439 (U.S. June 29, 2009) (No. 08-10322), the Sixth Circuit extensively discussed Supreme Court precedents governing judicial bias claims and circuit court case-law addressing such claims in the context of federal habeas review of state convictions. In holding on the basis of its review of the pertinent case-law that there is no constitutional right "clearly established" by the Supreme Court requiring a state trial judge to *sua sponte* recuse himself due to a familial relationship with the prosecutor, the *Railey* court explained in summary:

> The theme of these Circuit Court cases is that the Supreme Court has set out only two (perhaps three), very specific, situations in which something less than actual bias–that being a significant probability of bias–is sufficient to violate a party's constitutional right to due process. No case has held–or, more importantly, found the Supreme Court to have held–that mere appearance of bias is sufficient without something more. And no case has ever applied the possible-temptation test to find a sufficiently biasing interest resulting from mere kinship. Quite to the contrary, two circuit courts have held that mere kinship, without something more, is insufficient under the prevailing Supreme Court precedent....

*Id.* at 413.[23]

Here, petitioner has not alleged, nor is there any evidence in the record to suggest, that Judge Dinkelacker had an interest in the outcome of petitioner's trial which, under prevailing precedents, would trigger any due process concerns about the "appearance of bias." Petitioner's claim is based solely on his allegations that the judge's remarks and rulings at the second trial demonstrated an actual bias and lack of impartiality, which deprived petitioner of a fair trial.

The Supreme Court addressed this type of claim in *Liteky v. United States,* 510 U.S. 540 (1994). Although the Court in *Liteky* addressed statutory standards for the recusal of federal judges, the Sixth Circuit has relied on the decision in

---

[23] In *Railey*, the Sixth Circuit specified the two types of case where the Supreme Court "actually held that something less than actual bias violates constitutional due process–(1) those cases in which the judge 'has a direct, personal, pecuniary interest in reaching a [particular] conclusion,' ...; and (2) certain contempt cases, such as those in which the 'judge becomes personally embroiled with the contemnor.'" *Railey,* 540 F.3d at 400.

assessing judicial-bias claims under the Due Process Clause.  *See Lyell v. Renico,* 470 F.3d 1177, 1186 (6th Cir. 2006) (citing *Alley v. Bell,* 307 F.3d 380, 386 (6th Cir. 2002), *cert. denied,* 541 U.S. 963 (2004)).

In *Liteky,* the Supreme Court first pointed out that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and instead, [a]lmost invariably are proper grounds for appeal, not recusal."  *Liteky,* 510 U.S. at 555.  In the absence of a showing of reliance upon an extrajudicial source, judicial rulings "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" to implicate concerns about a judge's lack of impartiality.  *Id.*

The Court continued:

[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.  An example of the latter (and perhaps the former as well) is the statement alleged to have been made by [a] District Judge [in] a World War I espionage case against German-American defendants:  "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty."....  *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.

*Id.* at 555-56 (citation omitted) (emphasis in original).

Here, the Ohio courts' assessment of petitioner's claim of judicial bias neither is contrary to nor involves an unreasonable application of the applicable standard established by the Supreme Court in *Liteky*.

As Ohio's Chief Justice pointed out in both of his decisions denying petitioner's motions for disqualification, in order to establish judicial bias, petitioner first had to overcome the presumption that the trial judge properly discharged his official duties. *See Johnson v. Warren*, 344 F.Supp.2d 1081, 1093 (E.D. Mich 2004) (citing *Bracy*, 520 U.S. at 909); *see also Lavoie*, 475 U.S. at 820 ("the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea"). Petitioner's allegations are insufficient to overcome that presumption. Indeed, as the Chief Justice reasonably found in his decisions rendered both before and after petitioner's second trial, a review of the record of petitioner's second trial reveals no deep-seated antagonism or bias on the part of Judge Dinkelacker towards petitioner.

Contrary to petitioner's allegation in his first motion for disqualification, the "unrealistic trial date of July 19, 2004" in fact was changed to October 2004, and the trial judge's denial of petitioner's subsequent motion for an additional continuance was affirmed on appeal as falling well within the judge's discretion. Moreover, Judge Dinkelacker explained that his setting of a "million dollar, cash only bond" at the challenged bond hearing "was set in full compliance with the law" given that petitioner faced a sentence of 46 years to life on the charges set for retrial and "had been to prison before including for the shooting of another person." (Doc. 38, Ex. 4, attached "Exhibit A," p. 2).

Even rulings issued by Judge Dinkelacker that were reversed on appeal in *Smith II* were based on legal principles, which although found to have been made in error, were impartially determined based on the particular facts of the case. In any event, none of the trial court's rulings reflect the degree of favoritism or antagonism, found "only in the rarest circumstances," that is required to implicate concerns about the judge's "fair judgment." *See Liteky,* 510 U.S. at 555.

To the extent that petitioner has charged that the judge was in "collusion" with the prosecutor, there is simply no evidence in the record even remotely supporting such a claim. Petitioner's allegations that the judge directed the prosecutor at one pretrial hearing to find counsel to represent petitioner and held an

*ex parte* meeting with the prosecutor to discuss the case after petitioner's convictions at the first trial were reversed and the matter was remanded for retrial do not reflect any bias or prejudice on the part of the trial judge or that the trial judge and prosecutor were involved in a conspiracy against petitioner. *Cf. Railey,* 540 F.3d at 411-12 (discussing a decision by the Third Circuit in *Johnson v. Carroll,* 369 F.3d 253, (3rd Cir. 2004), *cert. denied,* 544 U.S. 924 (2005), where the court rejected petitioner's "appearance of bias" claim stemming from the judge's consideration of an *ex parte* communication regarding sentencing).

In addition, upon review of the record, it appears that most of the judge's challenged remarks at best amounted to expressions of "impatience, dissatisfaction, annoyance," and frustration with petitioner, whose conduct during the court proceedings concededly "tested [Judge Dinkelacker's] judicial temperament." (*See* Doc. 38, Ex. 4, attached "Exhibit A," p. 2). The comments certainly did not reflect the "high degree of favoritism or antagonism" necessary to trigger concerns about the impossibility of "fair judgment" by the judge.

In his letter to the Chief Justice responding to petitioner's charges, Judge Dinkelacker was honest in his assessment of his handling of the case, as he admitted that petitioner "is without question the most difficult defendant I have ever dealt with" and "tested my judicial temperament" with "his many antics and acts of fundamental unfairness." (*See* Doc. 38, Ex. 4, attached "Exhibit A"). Nevertheless, Judge Dinkelacker consistently and unequivocally stated that he had never "shown any bias or prejudice towards" petitioner and that he had conducted and would continue to conduct petitioner's proceedings with "fairness and in full compliance with the law." (*See id.*). He thoughtfully addressed each of petitioner's charges against him, including certain remarks about petitioner which he made at sentencing to justify his sentencing determination. As the state supreme court justice reasonably found, "both the tone and content of the judge's response show that he [was] neither biased nor prejudiced against the defendant." (*See* Doc. 52, Ex. J).

Finally, upon review of the record, the undersigned is convinced that petitioner was provided fair trials in the proceedings held before Judge Dinkelacker, particularly given the outcome of those trials–i.e., a hung jury at the second trial on the most serious charges of murder and attempted murder, and at the third trial, the dismissal of the attempted murder counts and a jury verdict of "not guilty" on the remaining murder charge.

Accordingly, in sum, because neither petitioner's allegations nor the record reflect the degree of hostility or antagonism that is required to trigger any possible due process concerns about the trial judge's "fair judgment" in this case, petitioner is not entitled to habeas relief based on his claim of judicial bias alleged in Ground "C" of the petition. *Cf. Williams v. Anderson*, 460 F.3d 789, 814-15 (6th Cir. 2006); *United States v. Lossia*, 193 Fed.Appx. 432, 437-38 (6th Cir. Aug. 22, 2006) (not published in Federal Reporter), *cert. denied,* 549 U.S. 1146 (2007); *Lewis v. Robinson,* 67 Fed.Appx. 914 (6th Cir. June 20, 2003) (not published in Federal Reporter), *cert. denied,* 540 U.S. 1187 (2004).

## F. Petitioner Is Not Entitled To Relief Based On The Merits Of His Undefaulted Claim Of Prosecutorial Misconduct Alleged In Ground "C"

As discussed above, the prosecutorial misconduct claim alleged in Ground "C" that was raised by petitioner and considered by the Ohio courts on appeal in *Smith II* is subject to review on the merits. In this remaining ground for relief, petitioner alleges that the prosecutor deprived him of his due process right to a fair trial by engaging "in repeated instances of misconduct in closing argument," which consisted of "argu[ing] prejudicial facts not in evidence;" "accus[ing] defense counsel of unfair tactics;" "[d]enigrating defense counsel and his argument to the jury;" "[r]idiculing defense's theory of the case;" and "[a]ccusing [petitioner] of fabricating his defense." (*See* Doc. 33).

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing these allegations on direct appeal in *Smith II*. In rejecting petitioner's prosecutorial misconduct claim, the court made findings of fact, which are presumed correct, *see supra* p. 35 n.21, and ruled in relevant part as follows based primarily on state-law standards:

> The prosecution is generally entitled to a "certain degree of latitude" in closing argument, but it must not attempt to obtain a conviction by going beyond the evidence that is before the jury. The trial court in its discretion generally determines the propriety of closing arguments.

> Where defense counsel has objected to improper remarks in closing argument, a conviction should be reversed if the improper remarks "prejudicially affected substantial rights of the defendant." Thus, unless the trial court has taken specific actions that have tempered the

prejudice from the comments, "it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found [the] defendant guilty." Where the defendant has failed to object to improper comments, this court will only reverse where the defendant has demonstrated plain error. Plain error is an obvious error or defect in the trial affecting substantial rights, which "but for the error, the outcome of the trial court clearly would have been otherwise."

Smith objected several times during the state's rebuttal closing argument. First, Smith objected after the prosecutor accused defense counsel of "sandbagging" the state by using Franklin's medical records in closing argument to undermine Franklin's credibility. The medical records indicated that Franklin was shot in the front of his leg, contradicting Franklin's testimony that he was shot in the back of his leg. The medical records were admitted into evidence, but defense counsel did not cross-examine Franklin on this discrepancy. Rather, defense counsel referred to the medical records in closing argument to discredit Franklin's testimony that he was attempting to flee when he was shot.

The "sandbagging" accusation was improper and unfounded. The state had possessed Franklin's medical records for over three years and had used them in Smith's first trial. But Smith's objection to the derogatory reference to defense counsel was sustained, and the trial court instructed the jury to disregard the comment.

Next, Smith complains that the prosecutor improperly insinuated to the jury that defense counsel did not believe his client's defense. The prosecutor stated in reference to Smith's closing argument, "We give closing argument. We're going to talk about self-defense for five minutes. That's how strong that self-defense theory is, isn't it? Five minutes of an hour-and-a-half closing argument. We don't want to get anywhere near that self-defense argument."

Smith objected, but before the court could rule, the prosecutor added, "Because his story is so incredible." The trial court overruled Smith's objection to these comments.

The prosecutor's first comment was improper for two reasons: (1) it mischaracterized Smith's closing argument, which almost in its entirety refuted the state's claim that Smith did not shoot the victims in self-defense, and (2) it attempted to present the jury with the irrelevant but potentially prejudicial insinuation that defense counsel personally thought that Smith was guilty. But the prosecutor had earlier made a similar comment that Smith had not objected to, and the jury was informed on several occasions that closing argument was merely argument.

The prosecutor's additional comment that Smith's claim of self-defense was "incredible" came close to an improper expression of the prosecutor's personal opinion about Smith's guilt. But the prosecutor followed the comment with a summary of the state's evidence contradicting Smith's defense, rendering the comment arguably within the latitude afforded counsel.

Later, the prosecutor cited matters not in evidence when he insinuated that Smith had come up with his self-defense theory only after the crime laboratory found gunshot residue on Gordon. The prosecutor had made a similar statement earlier in closing argument, when he, without objection, "testified" that Smith did not claim self-defense when proceedings were first instituted against him.

But the prosecutor did tie this argument to the evidence by illustrating that Smith did not mention self-defense to Pat B[e]rry when B[e]rry drove Smith to the police station to turn himself in. Further, after Smith objected to the comment about the timing of the defense in relationship to the release of the crime lab report, the trial court informed the jury that closing argument was not evidence and that the jury was to determine the facts of the case.

We hold that the trial court's actions in response to Smith's objections were sufficient to eliminate any prejudice from the prosecutor's misconduct, and that the jury would have found Smith guilty absent the prosecutor's improper remarks.

Next we review other comments that Smith alleges were improper but

that were not objected to at trial.  The prosecutor referred to defense counsel's attack on the credibility of the state's witnesses as "outrageous" and called the self-defense theory "ridiculous."  The prosecutor also attempted to inject emotion into the jury's deliberations and again "testified" by adding, "I'm fighting for Jimmy Gordon.  If you think the Prosecutor's Office–I guess, you know, I guess there is [sic] some people out there that say, well, they don't fight for a black, a black person who is a drug dealer.  Well, I got news for you, that's exactly what Dave and I, Dave Feldhaus, are doing."  But Smith did not object to these remarks, and they were not so egregious in the context of the entire trial that they denied Smith a fair trial, especially in light of the substantial evidence in support of his conviction.

Finally, Smith argues that this court must reverse to force the prosecution to abide by our warning in Smith's first appeal that it must refrain from misconduct during closing argument.  But our misconduct review focuses on "the fairness of the trial, not the culpability of the prosecutor."  We consider the prosecutor's behavior a reaction to Smith's own misconduct at retrial, but nonetheless we do not condone it....

Accordingly, the assignment of error is overruled.

(Doc. 38, Ex. 6, pp. 30-34) (footnote citations omitted).

Courts reviewing claims of prosecutorial misconduct in closing argument must "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'"  *United States v. Henry,* 545 F.3d 367, 377 (6th Cir. 2008) (quoting *United States v. Young,* 470 U.S. 1, 11 (1985), and citing *United States v. Hitow,* 889 F.2d 1573, 1579 (6th Cir. 1989)); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned[;]'" rather, the "relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally unfair in violation of due process); *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-43 (1974).  As the Ohio Court of Appeals recognized in this case, "the touchstone

of [the] due process analysis ... is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).

The due process inquiry involves an assessment of the "probable effect [of the prosecutor's alleged misconduct] ... on the jury's ability to judge the evidence fairly" when viewed within the context of the entire trial. *Young,* 470 U.S. at 12. Reversal of a conviction is warranted only if it is determined that the prosecutor engaged in "flagrant" misconduct. *Henry,* 545 F.3d at 376. Upon a finding of impropriety by the prosecutor in closing argument, courts consider four factors in determining whether the impropriety was "flagrant," or in other words, amounted to prejudicial error: (1) the degree to which the statements had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused. *Id.*

In addition, another factor must be considered in this case given that the prosecutor's challenged comments were made in response to defense counsel's closing argument. In assessing whether prejudicial error occurred in this "invited response" context, the court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *Id.* at 381 (quoting *Young,* 470 U.S. at 12). If found that the prosecutor's remarks were indeed "'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* (quoting

*Young,* 470 U.S. at 12-13).[24]

Finally, in this federal habeas corpus proceeding challenging a state conviction, the Court may not grant relief based on a finding of prosecutorial misconduct unless such error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Bates v. Bell,* 402 F.3d 635, 641 (6th Cir.) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)), *cert. denied,* 546 U.S. 865 (2005); *see also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.), *cert. denied,* 522 U.S. 1001 (1997).

Under this standard, the error must be evaluated in the context of the entire record. *Calderon v. Coleman,* 525 U.S. 141, 149 (1998). If, "when all is said and done," the Court is convinced that "the error did not influence the jury, or had but very slight effect," the conviction must stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995) (quoting *Kotteakos v. United States,* 328 U.S. 750, 764 (1946)). On the other hand, if the Court is "left in grave doubt" or "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," the conviction cannot stand. *Id.* at 437-38 (quoting *Kotteakos,* 328 U.S. at 765). This means that in cases "where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the petitioner "must win." *Id.* at 437.

Turning to the prosecutor's specific rebuttal remarks that were challenged on direct appeal, the Court concludes that although some of the comments were

---

[24] In *Henry,* the Sixth Circuit cited the following example of an "invited response" that did not amount to reversible error: "Although '[a] governmental attorney has a duty not to express a personal opinion or belief regarding the truth or falsity of any testimony or evidence,' the government may attempt to explain why, based on the facts, that witness's testimony is honest after the same has been attacked by the defense." *Henry,* 545 F.3d at 379 (quoting *United States v. Hurst,* 951 F.2d 1490, 1502 (6th Cir. 1991) (in turn citing *Young,* 470 U.S. at 8), *cert. denied,* 504 U.S. 915 (1992)); *cf. Hinkle v. Randle,* 271 F.3d 239, 245-46 (6th Cir. 2001) (holding that "[w]hile the prosecutor's remarks [in rebuttal argument] had the effect of bolstering the reliability of DNA evidence in general, they came in response to the defense counsel's invitation to comment on the state of the accuracy and reliability of DNA evidence;" therefore, petitioner failed to "show, to a degree sufficient to undermine confidence in the outcome of his trial, that the failure of his trial counsel to object to the prosecutor's rebuttal argument would have led to a different result" under *Strickland*).

sufficiently inappropriate to present a close question, federal habeas relief is not warranted in this case.

First, petitioner challenges the prosecutor's general statement that in rebuttal he would be responding to some of the "outrageous" things that defense counsel had said during closing argument. Although the statement was inflammatory, it was vague, isolated, and unlikely to have misled the jury, particularly when viewed in conjunction with the numerous emotionally-charged statements made by defense counsel in closing argument to the effect that the State's case was built on lies and distortions of the truth.

Second, petitioner challenges certain remarks made by the prosecutor in response to defense counsel's closing argument attacking the credibility of all of the State's witnesses, including victim Steven Franklin. Indeed, the crux of defense counsel's argument was that the prosecution's "parade of witnesses" consisted of police officers who "shaded their testimony ... to cover their butts," as well as drug dealer "thugs" who "not only ... shade[d] their testimony in their favor, but flat out lied." (*See* Doc. 40, Tr. 1631-32, 1639).

In closing argument, defense counsel specifically accused Franklin of "flat out l[ying] ... on the witness stand," and claimed that Franklin's "story" of being shot while running away from petitioner "absolutely defies logic, and even defies physics." (*Id.,* Tr. 1665, 1667). After pointing out various inconsistencies and problems with Franklin's testimony, counsel stated:

Do you need anything more about Steve Franklin?

Do you want me ... to show you that the man is an absolute liar? I can do that.

You want to talk about not having a dog in the fight. What evidence in front of you has absolutely no dog in the fight? His medical records, right? ...

We'll go through the medical records.... It shows his body. Shows the front of his body and they show the back of his body. That's where they document where the injuries are.

****

....Look at the back of his leg.  Is there a gunshot wound on the back of his leg?  Absolutely not.  Read the medical records.  Shot in the medial thigh, the middle of the thigh.  Right there on the photo, in the front, not in the back.

Where else is he shot?  In the elbow.  Not the back of the elbow which would indicate his back to him.  Right here, the front of his elbow.

Where is the other shot?  Right square in the front of his chest.  Absolutely corroborates one hundred percent, without a doubt what this man said.  When Steve Franklin got shot, he was coming straight at him.  He wasn't running behind a corner like he comes in here and lied to you, ... and what the prosecutor wants you to believe.  Absolutely indisputable evidence.  And this, ladies and gentlemen, has no dog in the fight.

(*Id.,* Tr. 1667-69).

In rebuttal, the prosecutor argued as follows:

First of all, ... talk about this.  This is the most important piece of evidence in the case.

You now know for a fact that ... Franklin lied.  Well, guess who never asked ... Franklin a single question about the medical record. ...Franklin sitting there on the stand, Steve sitting there, he sat there for two, two-and-a-half hours, and was crossed.  This is the most important piece of evidence the defense has.  It corroborates everything that Mr. Smith says, everything.  Never asked him a single question about it.

It's what we call in the courtroom, sandbagging you.

(*Id.*, Tr. 1690).  At that juncture, defense counsel lodged an objection, which was sustained; the court directed the jury to "disregard the last comment."  (*Id.*).

The undersigned finds that the prosecutor did not exceed the bounds of propriety in pointing out in rebuttal as an "invited response" that defense counsel never sought to undermine Franklin's credibility with such an important piece of evidence favorable to the defense on cross-examination during the trial. The final reference to "sandbagging" was improper and appears to have been intentional. However, it was a passing remark, and the error was immediately corrected by the trial judge who ordered the jury to disregard the comment. It is highly unlikely that the remark had any prejudicial effect on the jury's verdict.

Third, petitioner challenges a set of statements made by the prosecutor responding to the defense theory of the case, which was that petitioner had acted in self-defense.

Specifically, petitioner objects to the following comments referring to his belated assertion that he acted in self-defense; petitioner claims these comments improperly suggested to the jury that he had fabricated the defense:

1. Dave and I got this case, as you know now, May 14th of 2001. And we were assigned this case shortly after this case took place. And since the beginning, the first thing – the first thing Dave and I looked at each other and said, you know ... – what possible defense could they have to this? Because at this point in time it was never a defense. We never had a clue what the defense was. He didn't just shoot? Self-defense? Never mentioned self-defense. Never mentioned.

We looked at each other, could he possibly say he acted, ... – what was going on in this man's mind? They come in here and say, well, he acted reasonably. That's one of the things the defense attorney just said. He acted reasonably.

2. You know we critici[z]e [State witness] Darryl McGee for not coming forward with his ... testimony. But self-defense, when did we hear self-defense? When does that get proclaimed? First time you talk to anybody on the phone? Did we see a parade of witnesses, they're here, oh, man, he called me that night and said self-defense. Man, it was self-defense.

\*\*\*\*

He gets on the phone with Pat Berry. Pat Berry, Pat, I got to turn myself in, you know. I'm afraid all these people are going to kill me.... Does he tell Pat Berry about self-defense? When does self-defense show up?

Showed up about the same time they found a particle of barium and antimony [on victim Jimmie Gordon's hand].

(*Id.,* Tr. 1691-92, 1696-97).

The state appellate court reasonably found these statements were improper to the extent that the prosecutor insinuated as "facts" matters that had not been introduced into evidence – *i.e.*, that self-defense was never mentioned as a defense and, indeed, was not asserted as a defense until the crime laboratory results came back showing that Jimmie Gordon's right hand contained a chemical particle consistent with gunshot residue.

Defense counsel did not object to the first challenged remark, which was directed at a statement made by defense counsel in his closing argument that petitioner "acted reasonably." Although the comment was improper to the extent the prosecutor stated that self-defense was "never mentioned" as a defense early in the proceedings, it was not egregious when viewed in the context of the entire record.

With respect to the second set of remarks, no due process concerns are triggered by the prosecutor's initial comment that no defense witnesses were called to testify that petitioner claimed immediately after the shootings that he had acted in self-defense. The comment was invited to the extent that defense counsel had argued that the testimony of State witness Darryl McGee should not be believed because he did not come forward as an eyewitness to the events until over a year after the shootings. (*See* Doc. 40, Tr. 1656-57). Moreover, as the Ohio Court of Appeals reasonably determined, the prosecutor did connect this argument to the evidence by pointing out that petitioner failed to mention self-defense to Pat Berry when he was driven by Berry to turn himself in to the police. (*See id.,* Tr. 1696-97).

Of greater concern is the prosecutor's last comment specifically tying the timing of petitioner's assertion of self-defense to when he was informed of crime

laboratory results that could be used to support such a defense. However, as the Ohio Court of Appeals pointed out, defense counsel objected to that statement, and the following colloquy ensued:

> THE COURT:  Hold on a second.  Closing argument.  The jury makes the determination as to what the facts are.  I'm not sure what your basis–
>
> [DEFENSE COUNSEL]:  There is – he's saying things that aren't even in evidence.  When the ... self-defense came up.
>
> THE COURT:  Do it this way.  Ladies and gentlemen, as I instructed earlier, this is not evidence.  You will make the determination as to what the facts of this case are.  This is closing argument, it's merely argument.

(*Id.,* Tr. 1697).  Although the challenged remark was intentional, the undersigned is not persuaded that the jury, which heard defense counsel's reasoned objection and the court's admonition, was prejudiced by it.

Petitioner has objected to three more remarks by the prosecutor responding to the self-defense theory argued by defense counsel, which petitioner essentially claims denigrated defense counsel and ridiculed the defense position.  In two of the challenged comments, the prosecutor referred to defense counsel's spending only five minutes of his "hour-and-a-half closing argument" talking about self-defense. (*See* Doc. 38, Ex. 4, pp. 16, 17; *see also* Doc. 40, Tr. 1689, 1693).   In one of these references, the prosecutor additionally commented that this showed "how strong that self-defense theory is" and that defense counsel did not "want to go anywhere near that self-defense argument."  (Doc. 40, Tr. 1693).  Defense counsel objected to that remark, but before the court could rule on the objection, the prosecutor completed his statement about defense counsel's not "want[ing] to go anywhere near that self-defense argument," by commenting further: "Because his story is absolutely incredible."  (*Id.*).  Defense counsel's objection was overruled.  (*Id.*).

In the third challenged remark made near the end of rebuttal argument, the prosecutor stated:

....The defense – I mean, the self-defense theory is so ridiculous that it's, you know, go back and talk about it. But you really think it's there?

You know, Dave said, I said it too, maybe I'm missing something, you know....

(*Id.,* Tr. 1708).

The Ohio Court of Appeals determined that the prosecutor's comments about defense counsel's spending only five minutes of his closing argument discussing self-defense amounted to a mischaracterization of defense counsel's argument and a "potentially prejudicial insinuation that defense counsel personally thought that [petitioner] was guilty." (Doc. 38, Ex. 6, p. 32). The court also expressed concern about the propriety of the prosecutor's reference to the defense as "absolutely incredible," which "came close to an improper expression of personal opinion." (*Id.*).

This particular claim of prosecutorial misconduct is troubling. The undersigned agrees that the prosecutor's characterization of petitioner's claim of self-defense as "ridiculous" and "absolutely incredible" reflected his and his colleague's personal opinion about the defense theory, which was inflammatory and neither isolated nor accidental in nature. Moreover, the prosecutor went even further by improperly insinuating in his remarks that defense counsel himself believed that the self-defense theory of defense was weak.

On the other hand, the undersigned is not as concerned as the state appellate court about the prosecutor's "mischaracteriz[ation]" of defense counsel's argument. It appears that indeed, as the prosecutor mentioned in his first challenged comment, most of defense counsel's argument was devoted to attacking the State's witnesses and version of events as opposed to focusing on the evidence that the defense had affirmatively presented to establish petitioner had acted in self-defense. Moreover, most importantly, upon review of the record, the undersigned finds that it is highly doubtful that the jury was misled by the prosecutor's remarks into believing that defense counsel personally thought petitioner was guilty. Defense counsel vociferously and effectively argued that his client should be found innocent because the credibility of each State witness was subject to challenge and, therefore, the State had not met its burden of proving the facts necessary to establish petitioner's guilt.

Upon review of the record, it further appears that the most troubling of the prosecutor's comments were made in the context of addressing petitioner's claim of self-defense when he shot Jeffrey King. (*See* Doc. 40, Tr. 1693). The criminal charges against petitioner for the shooting of King, however, were ultimately dismissed. (*See* Doc. 38, Ex. 26).

The evidence against petitioner with respect to the other victims who were shot on Pendleton Street was strong. In addition to victims Franklin and Ridley, Darryl McGee and Lucretia Williams were eyewitnesses to that incident and testified for the State about their observations; although there were inconsistencies in their testimonies about some of the details observed, they all consistently testified that petitioner began shooting without being shot at or attacked by anyone on the street. Moreover, the police officers who responded to the scene did not find any weapons on or about victims, and the firearms examiner for the Hamilton County Coroner's crime lab testified that all of the spent bullet casings found at the scene were fired from the same 9mm semiautomatic pistol, which petitioner did not dispute was the weapon that he had carried.

Therefore, despite the impropriety of the prosecutor's comments which were sufficiently egregious to trigger due process concerns, the undersigned is convinced, "after pondering all that happened without stripping the erroneous action from the whole," that the error was harmless and did not have a substantial and injurious effect or influence on the jury in determining the verdicts of guilt attacked in this case. *See O'Neal*, 513 U.S. at 437-38 (quoting *Kotteakos,* 328 U.S. at 765).

Finally, perhaps the most egregious comments of all were contained in the following statement by the prosecutor at the close of his rebuttal argument:

> You know the truth is something that is very, very precious to me. You know, that's what I deal with every single day.

> As a prosecuting attorney, Dave and I ..., we're out there trying to find the truth. You really think there is a grand conspiracy, that I've got nothing better to do, Dave Prem has got nothing better to do, Dave Feldhaus has got nothing better to do than to make up a case against this man?

> Well, if you believe that, you know, I'm fighting for Jimmy Gordon. If

you think the Prosecutor's Office – I guess, you know, I guess there [are] some people out there that say, well, they don't fight for a black, a black person who is a drug dealer. Well, I got news for you, that's exactly what Dave and I ... are doing.

(Doc. 40, Tr. 1712-13).

In these remarks, the prosecutor exceeded the bounds of propriety by essentially vouching for the integrity of the Prosecutor's Office and appealing to the jury's emotions, as opposed to arguing for verdicts of guilt on the basis of the evidence. *See Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000), *cert. denied,* 533 U.S. 941 (2001).

Nevertheless, when viewed in the context of the entire record, the offensive remarks were to a large extent "invited" by defense counsel, who himself made numerous emotional appeals, including appeals to fear, in closing argument; cited certain "facts" that were not introduced into evidence at trial (such as one State witness, Lucretia Williams, having a motive to lie because she was "living in [a] building with a dope dealer that's running the neighborhood"); and spent most of the time arguing that the prosecution had built its case against petitioner on lies and "shad[ings]" of the evidence. (*See* Doc. 40, Tr. 1628-89).

Specifically, defense counsel accused the police of taking a "hands-off approach" in the neighborhood, replete with riots, robberies, gangs, and armed drug dealers, and "turn[ing] their back" on petitioner. (*Id.,* Tr. 1644). Counsel further stated that "there is no doubt in my mind the police officers shaded their testimony to be in their favor, to cover their butts for them not doing the right thing for Mr. Smith." (*Id.,* Tr. 1639; *see also id.,* Tr. 1642-43).

In addition, defense counsel made numerous references to the victims and other State witnesses as "thugs" and "drug dealers," who lie, carry weapons and are adept at getting rid of incriminating evidence. (*See, e.g., id.,* Tr. 1634, 1645, 1649-50, 1661, 1666-67, 1684). Indeed, at one point in his argument, defense counsel stated: "Do you think a gun-toting drug dealer is going to come in here on the stand and tell you the truth?" (*Id.,* Tr. 1647).

In a particularly egregious portion of his argument, defense counsel remarked:

....I want you to imagine something.  Imagine you put up with the crap that this man did, with these thugs and drug dealers that the State wants to call as witnesses, for as long as he did.  Imagine that.  And then imagine someone puts you on the ground and holds a gun in the back of your head and threatened to blow your brains out.  And you call the police, you do the right thing, and they don't do a damn thing about it....

\*\*\*\*

The police don't do anything about it.  They let the guy go that you identify as the one that shot him, or that put the gun to your head.  They let the two other guys go that you positively identify.  And then you defend yourself, and have some God awful situation that we, cannot imagine, but you survive.

But you survive to come in here and to be put on trial for murder.  And this, and you see Steven Franklin, gets up there and he says I got shot in the back.  I was trying to get away.  I was running.  And it's absolutely a lie.

Would you get upset at that?  Would you be able to get on this stand and just use your head only, not your heart?  I would be mad.  You should be mad that this is the kind of evidence that the State wants you to sentence this man to the penitentiary on.

(*Id.,* Tr. 1669-70).

Defense counsel re-emphasized this point by making the following extensive, emotionally-charged statement to the jury at the close of his argument:

....I ask that you keep in mind when you deliberate that, as you sit there, you can say that I will never commit a crime.  You can make that promise to yourself, because you have control of that.  But you cannot say to yourself, I will never have to defend myself, because that's something you have absolutely no control over.

And if God forbid you have to do that, and you have to take somebody's life, and the State parades these thugs, drug dealers, liars,

people that testify in manners that are totally inconsistent with physics, with their medical records, because they want to get rid of you, ... is that the kind of evidence you would want to be used against you if you were in that situation?

Two things went very wrong in this case. The conduct of these thugs that terrorized Mr. Smith, and the response of the police on May 13th that allowed these guys to stay out on the street which led to the shooting of May 14th.

And, again, put yourself in his shoes.... How would you feel if you knew what the truth was and somebody is sitting on the stand just intentionally trying to lead you down this prim rose path? You would be upset about it. You would be very upset about it.

I tell you, Mr. Smith, he's frustrated, he's tired, he's mad, and for what he's been through, he has every right to be.

I also found it ironic that these people – Franklin, Ridley, King – these people that have absolutely nothing but contempt for this legal system, no respect, no respect for police officers, lies to them at will, deals drugs out on the street, they now want to use this system to get rid of this thorn in their side.

And this man, all he wanted to do, he didn't like these people dealing dope out on the street.... But because he stood up to them, he's in that chair right now.

****

....[W]hen I went home last night I tried to think, how do I put you in his shoes....

I thought about how, as part of [a prior job as a police officer], you're out there in the middle of the night, and there you deal with some thugs, people who have no respect for the law, and sometimes they ... want to fight with you. And I thought about, I have experienced real fear, because I got that gun. I can't lose. When you get in a fight as a police officer, you cannot lose. If you go unconscious, they get the gun, you're dead. Yes, I do. I think I do know fear.

> And then I realized, no, that's not a fair analogy, because in that situation I had a radio here. I could call for help....
>
> This man had no radio. And I thought about how I would feel without that radio. And for a moment, ... I got a glimpse of the fear, and then terror that that man must have felt when he was out on that street by himself, no police, nobody to help him out.

(*Id.,* Tr. 1684-89).

In light of defense counsel's argument, extensively appealing to the emotions of the jurors and specifically asking them to identify with petitioner and calling on them to experience his "fear" and even "terror" of living in a neighborhood of "thugs" like the victims, the undersigned concludes that the prosecutor's improper and inflammatory statement responding to defense counsel's argument did not deprive petitioner of a fair trial. Indeed, it appears from the record that during deliberations, the jury returned with questions to the Court about the evidence presented at trial, which indicates that the jurors were not incited by passions or prejudices in determining the verdicts of guilt and in reaching an impasse on the murder and attempted murder counts in this case.

Accordingly, in sum, petitioner is not entitled to habeas relief based on his unwaived claim of prosecutorial misconduct alleged in Ground "C" of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended (*see* Docs. 1, 25, 33) be **DENIED** with prejudice.

2. A certificate of appealability should not issue on any of the claims alleged in Grounds "B" and "C" of the petition that the undersigned has concluded are waived and thus procedurally barred from review, because under the the first prong of the two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct

in its procedural ruling.[25]

A certificate of appealability also should not issue with respect to the double jeopardy claims alleged in Ground "A" and a portion of Ground "B," the claims alleged in Grounds "B" and "D" challenging petitioner's sentences, the claim alleged in Ground "B" challenging the trial court's refusal to give a lesser offense instruction, and the undefaulted judicial misconduct claims alleged in Ground "C." Reasonable jurists would not find it debatable whether any of these claims should have been resolved in a different manner or, alternatively, whether the issues presented are "adequate to deserve encouragement to proceed further." *Miller v. El-Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack,* 529 U.S. at 484); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

A certificate of appeability, however, should issue with respect to the undefaulted prosecutorial misconduct claim alleged in Ground "C," which was addressed on the merits herein, because reasonable jurists would find it debatable whether that claim should have been resolved in a different manner. *See id.*

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, should **GRANT** petitioner leave to proceed on appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:   7/9/09                                        s/Timothy S. Black
        cbc                                       Timothy S. Black
                                                  United States Magistrate Judge

---

[25] Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in any of the waived grounds for relief alleged in petition. *See Slack,* 529 U.S. at 484.

Garey Smith,
      Petitioner

     vs                             Case No. 1:07cv977
                                     (Dlott, C.J.; Black, M.J.)

Warden, Southern Ohio
Correctional Facility,
      Respondent

# NOTICE

      Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).